**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the Class***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JEFF HULL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>GLOBAL DIGITAL SOLUTIONS, INC., RICHARD J. SULLIVAN, DAVID A. LOPPERT, WILLIAM J. DELGADO, ARTHUR F. NOTERMAN, and STEPHANIE C. SULLIVAN,<br><br>Defendants. | Case No.3:16-cv-05153-FLW-TJB<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Michael Perry ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Amended Complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents and announcements, United States Securities and Exchange Commission ("SEC") filings by Global Digital Solutions, Inc. ("Global Digital" or the "Company"), a review of documents associated

with the SEC's "Complaint for Injunctive and Other Relief" ("SEC Complaint")1 against the Company and its executives, as well as the Consent Decrees resulting from the SEC action, a review of documents associated with the adversary proceeding between the Company and the Chief Executive Officer ("CEO") of Airtronic USA, Inc. ("Airtronic"), interviews with witnesses, as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased the publicly traded Global Digital securities from October 8, 2013 through August 11, 2016, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors and various persons who improperly promoted Global Digital common stock to investors.

2. During the Class Period, unbeknownst to investors, Global Digital stock was worthless. Defendants disseminated false and misleading statements and participated in several blatantly fraudulent schemes, artifices and devices, knowingly or recklessly designing each to inflate the price of Global Digital common stock artificially. These fraudulent schemes and materially false and misleading statements succeeded, enabling Global Digital to raise critical

[1] The SEC Complaint, *Securities and Exchange Commission v. Global Digital Solutions, Inc., et al.*, Case No. 9:16-cv-81413 (S.D. Fla.), is attached hereto as Exhibit A.

cash through private offerings and to use its stock as currency, thus avoiding both cash expenses and severe dilution of Global Digital's public float.

3. First, Global Digital entered into an agreement to acquire 70% of Airtronic, a small weapons and arms manufacturer in bankruptcy. Upon confirmation of Airtronic's bankruptcy plan on October 2, 2013, the bankruptcy court set a deadline of sixty days, or until December 2, 2013, for Global Digital and Airtronic to close the merger. Within days of the October 2, 2013 announcement, Global Digital began issuing press releases, quoting Defendant Richard Sullivan touting Airtronic's becoming the Original Equipment Manufacturer ("OEM") supplier of grenade launchers for a major international client under a private label agreement, with a first stage value of $95 million, and also containing quotes attributed to Merriellyn Kett, ("Kett"), Airtronic's President, Chairman of the Board of Directors, and sole shareholder. There was no such agreement; Defendants fabricated the Kett quote. Even after Kett informed Defendants that no such contract existed and repeatedly requested that Defendants remove the false statements from Global Digital's website, Defendants issued a third press release falsely touting the fake contract. Just a few weeks later, Defendants used the positive publicity to raise $50,000 through a private placement offering. The SEC Complaint deemed the press releases "fraudulent" and "false and misleading." According to the SEC Complaint, Global Digital's failure to remove the false statements caused Airtronic to terminate the merger.

4. Second, on November 15, 2013, Global Digital issued a press release announcing "Expected Near-Term Results." The Company announced that before the end of 2013, it "expects to announce several agreements regarding potential acquisitions." The Company further announced that "if these additional strategic acquisitions move forward as expected," Global Digital anticipates "an annual revenue run rate between $60 million and $75 million

during the first quarter of 2014," *i.e.*, between $15 million and $18.75 million in revenue in the first quarter of 2014. Defendants' forecast, however, was knowingly false, and, according to the SEC Complaint, "without basis," as Defendants knew that Global Digital had neither the cash nor credible financing to acquire any company that would yield the revenues Defendants forecasted. On March 28, 2014, the Company was forced to admit that it had revenues of $0 during the first quarter of 2014.

5. Third, on March 11, 2014 and March 12, 2014, Global Digital issued press releases announcing an unsolicited bid to acquire Remington Outdoor Company, Inc., aka Freedom Group, Inc. ("Remington"), a large arms manufacturer, for over $1 *billion* in cash and stock, as well as two further acquisitions. Defendant Richard Sullivan was quoted as being "extremely excited and confident about all three of these proposed acquisitions." The press releases were false, as Global Digital had only $272,000 in cash, no credible financing options, and Defendants knew that Remington had, previously, repeatedly rejected the Company's unsolicited bid.

6. No Defendant disclosed any of these schemes, artifices and devices to defraud, but the schemes were effective at inflating and/or maintaining Global Digital's stock price during the Class Period. This was critical because from 2012 on, Global Digital was a publicly traded company in search of profitable operations, with $0 in revenue in both 2012 and 2013.

7. During the Class Period, Defendants' schemes succeeded, and the Company used its inflated stock for purchases. In April 2015, Global Digital announced the acquisition of North American Custom Specialty Vehicles, LLC ("NACSV"), for consideration of cash and artificially inflated stock. On October 22, 2015, the Company announced an agreement to

purchase Grupo Rontan Electro Metalurgica, S.A. ("Rontan"), a large Brazilian company, with half of the purchase price paid for with artificially inflated Global Digital stock.

8. On August 11, 2016, the SEC filed its complaint, alerting investors to the totality of the schemes Defendants perpetrated, rendering Global Digital's all but worthless.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

11. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the Company is incorporated in this District and a substantial part of the conduct complained of herein occurred in this District.

12. In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the over-the-counter exchange ("OTCQB").

## PARTIES

13. Lead Plaintiff Michael Perry purchased Global Digital securities at artificially inflated prices during the Class Period and has been damaged thereby. Perry's PSLRA certification was previously filed with this Court and incorporated by reference.

14. Defendant Global Digital is a New Jersey corporation whose principal executive offices were located during the Class Period at 777 S. Flagler Drive, Suite 800, West Palm

Beach, Florida 33401. Global Digital no longer has offices at this address. During all relevant periods, Global Digital securities traded on the OTCQB under the ticker symbol "GDSI."

15. Defendant Richard J. Sullivan ("R. Sullivan") was the CEO and Chairman of the Board of Directors ("Chairman") of the Company from August 12, 2013 until his resignation on May 13, 2016.

16. Defendant David A. Loppert ("Loppert") was the Chief Financial Officer ("CFO") of the Company from August 12, 2013, until April 10, 2015.

17. Defendant William J. Delgado ("Delgado") served as President, CEO and CFO from August 2004 to August 2013. Effective August 12, 2013, Mr. Delgado assumed the position of Executive Vice President, and during the Class Period, was responsible, along with Defendant R. Sullivan, for "business development." On May 13, 2016, Delgado was appointed the CEO and Chairman of the Company.

18. Defendant Arthur F. Noterman ("Noterman") was a director of the Company from August 12, 2013, until his resignation on May 13, 2016.

19. Defendant Stephanie C. Sullivan ("S. Sullivan") was a director of the Company from August 12, 2013 until her resignation on May 13, 2016. She is the daughter of Defendant R. Sullivan.

20. Collectively, Defendants R. Sullivan, Loppert, Delgado, Noterman, and S. Sullivan are herein referred to as "Individual Defendants."

21. Collectively, Defendant Global Digital and the Individual Defendants are herein referred to as "Defendants."

22. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g. approved or ratified these statements in violation of the federal securities laws.

23. Global Digital is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment and with authorization.

24. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Global Digital under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### ***Background – Global Digital – A Company in Search of Operations***

25. Global Digital is a shell company in search of a business – and has been since its inception. According to its annual report on Form 10-K for the year ended December 31, 2013 (the "2013 10-K"), in 2004 Creative Beauty Supply, Inc. acquired Global Digital, which became the new Company's name. The Company disposed of all its assets, and began pursuing government contracts for audio and video services. Almost all of these operations were wound down in 2005, and all were disposed of by the end of 2012. Beginning on May 1, 2012, the former beauty supply company shifted to "refocus[ing] our efforts in the area of small arms manufacturing, knowledge-based and culturally attuned social consulting and security-related solutions in unsettled areas."

26. According to the 2013 10-K, signed by Defendants R. Sullivan, Loppert, Delgado, Noterman, and S. Sullivan, Global Digital had no revenue whatsoever in either 2012 or 2013.

### ***Background – Global Digital's Pre-Class Period Interactions with Airtronic***

27. Airtronic was founded in 1993 and is a manufacturer of small arms pursuant to the Standard Industrial Classification Code. Airtronic assembles arms and weapons pursuant to United States government specifications and distributes the weapons via subcontractors to the United States military, specific foreign allies, and occasionally to private federal agency customers. Airtronic's approved weapons include grenade launchers, assault rifles, and machine guns. Airtronic's operations are closely monitored by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). All those involved in Airtronic's affairs must be fully investigated and approved by the ATF. Kett, the President, Chairman, and sole shareholder of Airtronic, had obtained such approval.

28. The Defense Contract Management Agency ("DCMA") regulates the security measures that Airtronic must follow to ensure the safeguarding of drawings, specifications, parts and finished weapons. The Defense Security Services enforces strict Security Operating Procedures to regulate vaults, camera systems, outside security firms hired to patrol, theft prevention systems within its facilities for stored components and finished weapons as well as the transportation of weapons to and from Airtronic's live-fire range. For all weapons manufactured and assembled by Airtronic, the suppliers must be approved by the DCMA and ATF. The DCMA carefully monitors all of Airtronic's purchase orders, including the delivery of weapons to a foreign military.

29. On March 13, 2012, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against Airtronic, styled as *In re: Airtronic USA, Inc.*, Case No. 12-09776 (N.D. Ill.). On May 17, 2012, the bankruptcy was converted to a case under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Proceeding").

30. Before and after Airtronic entered into bankruptcy, Kett attempted to obtain an infusion of working capital into Airtronic, so that Airtronic could preserve its government contracts. In or about August 2012, Kett first met with Defendants R. Sullivan and Loppert to discuss Airtronic's business, according to a filing in the adversary proceeding, *Global Digital Solutions*, *Inc.*, *v. Airtronic USA*, *INC.*, 13-1330, filed in Airtronic's bankruptcy in the Northern District of Illinois (the "Adversary Proceeding").

31. On August 13, 2012, Airtronic and Global Digital executed a letter of intent involving a prospective merger (the "Merger"). Global Digital agreed to furnish a bridge loan to Airtronic in order for Airtronic to sustain its operations through confirmation of a plan of reorganization approving the Merger and treatment of creditors' claims. Following

reorganization, Global Digital would receive 70% of the issued and outstanding common stock of Airtronic, with Kett, Airtronic's sole shareholder at the time, retaining the remaining 30% of Airtronic stock.

32. As stated in Airtronic's Answer and Affirmative Defenses to Plaintiff's Adversary Complaint, filed in the Adversary Proceeding on November 25, 2013 (the "Airtronic Answer"), the conditions precedent to the closing of the Merger between Airtronic and Global Digital were: (i) approval of the bankruptcy court and creditors; (ii) approval by the governmental licensing authorities regarding the change in control at Airtronic; and (iii) other conditions set forth in the definitive merger documents. On October 22, 2012, the parties entered into the merger agreement. From October 2012 through November 2013, Global Digital was actively involved in the day-to-day management of Airtronic, pending the reorganization.

33. Pursuant to the terms of the Merger, Global Digital represented that it would make a lump sum bridge loan of $750,000 to Airtronic by no later than October 23, 2012, a crucial term for Airtronic, which needed the funds to fill a $2,400,000 purchase order for grenade launchers, which would only be approved if Airtronic could demonstrate its financial ability to fill the order. Receipt of the $750,000 from Global Digital would satisfy this requirement. Failure to receive the funding would result in the loss of important government contracts.

34. Although, according to the Airtronic Answer, Global Digital represented to the bankruptcy court it had these funds in its possession, the bridge loan was not funded on October 23, 2012. Despite multiple assurances from Defendant Loppert, on different dates, Defendants failed to provide the loan through the end of 2012 and into January of 2013. Kett became concerned about Global Digital's ability to follow the terms of the merger agreement.

35. By mid-February 2013, Global Digital was pushing hard to make significant changes to the terms of the bridge loan, terms previously approved by the bankruptcy court in October 2012. Faced with financial pressure and lacking leverage, Kett began negotiating updated terms with Global Digital in March 2013.

36. As of April 30, 2013, Airtronic's balace sheet, filed in the bankruptcy proceeding, showed that it had no large contracts pending.

**Balance Sheet**
**As of 4/30/2013**

**Airtronic USA, Inc. (AUI)**

| | | | | | |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| **Current Assets** | | | | | |
| 1000 | Cash - Southport Checking | $ | -61.89 | | |
| 1010 | Cash - MB Financial Checking | $ | 37,409.82 | | |
| 1100 | Accounts Receivable | $ | 18,425.60 | | |
| 1105 | Allowance Doubtful | $ | -117,144.46 | | |
| 1150 | IDOR Receivable | $ | 562.34 | | |
| 1200 | Inventory - Raw Materials | $ | 171.90 | | |
| 1210 | Inventory - Work in Process | $ | 1,428,581.59 | | |
| 1220 | Inventory - Finished Goods | $ | 29,690.60 | | |
| 1315 | Loan Closing Costs | $ | 6,035.00 | | |
| 1316 | Accumulated Amortization - Loan Costs | $ | -5,035.00 | | |
| 1320 | Advances to Badger | $ | 514,347.14 | | |
| 1330 | Advances to Fusil | $ | 65,599.04 | | |
| 1350 | Advances to Employee | $ | 1,200.00 | | |
| | **Total Current Assets:** | | | $ | 1,979,781.68 |
| **Fixed Assets** | | | | | |
| 1500 | Computer Hardware | $ | 117,047.17 | | |
| 1501 | Computer Software | $ | 65.00 | | |
| 1510 | Furniture & Fixtures | $ | 9,276.51 | | |
| 1520 | Leasehold Improvement | $ | 23,989.55 | | |
| 1525 | Auto & Truck | $ | 3,370.00 | | |
| 1530 | Machinery & Equipment | $ | 114,766.24 | | |
| 1550 | Tooling -M16 | $ | 374,105.00 | | |
| 1551 | Tooling - M203 | $ | 147,271.37 | | |
| 1552 | Tooling - M2 | $ | 25,840.00 | | |
| 1553 | Tooling - RPG -7 | $ | 24,204.33 | | |
| 1556 | Tooling - Other | $ | 28,506.00 | | |
| 1600 | Accumulated Depreciation | $ | -821,266.52 | | |
| 1700 | Intellectual Property | $ | 25,000.00 | | |
| | **Total Fixed Assets:** | | | $ | 72,174.65 |
| **Other Assets** | | | | | |
| 1800 | Deposits | $ | 6,673.33 | | |
| | **Total Other Assets:** | | | $ | 6,673.33 |
| | **Total Assets:** | | | $ | 2,058,629.66 |
| **Liabilities** | | | | | |
| 2000 | Accounts Payable | $ | 1,520,377.43 | | |
| 2200 | Advances - MEK | $ | 482,988.58 | | |
| 2230 | Note Payable - Fox | $ | 147,165.58 | | |
| 2250 | N/P - Southport Bank | $ | 177,436.89 | | |
| 2260 | N/P-GDSI Bridge Loan | $ | 467,625.61 | | |
| | **Total Liabilities:** | | | $ | 2,795,594.09 |
| **Equity** | | | | | |
| 3000 | Capital Stock | $ | 1,000.00 | | |
| 3020 | Distributions | $ | 14,200.00 | | |
| 3200 | Retained Earnings | $ | -385,705.40 | | |
| 3200 | Retained Earnings-Current Year | $ | -366,459.03 | | |
| | **Total Equity:** | | | $ | -736,964.43 |
| | **Total Liabilities & Equity:** | | | $ | 2,058,629.66 |

**Run Date:** 5/14/2013 3:35:57PM **Page:** 1
**G/L Date:** 4/30/2013

37. On October 2, 2013, the U.S. Bankruptcy Court for the Northern District of Illinois confirmed Airtronic's amended plan of reorganization (the "Plan"). The court set a sixty day deadline, *i.e.*, on or before December 2, 2013, for Global Digital and Airtronic to finalize the merger, so that Airtronic could obtain the funds necessary to pay its creditors, in accordance with the Plan.

***Global Digital's October 2015 Press Releases Concerning Airtronic***

38. On October 8, 2013, Defendants issued a press release entitled "Global Digital Solutions' Planned Merger Partner, Airtronic USA, Becomes Exclusive OEM Supplier for a Major International Client Under a Private Label Agreement With an Estimated First Stage Value of Approximately $95 Million."[2] The claim in the title was repeated in the body of the release. Defendant R. Sullivan was quoted as stating "[t]his is exciting but not completely unexpected news…. The agreement demonstrates what we have been saying all along: Airtronic is well-positioned for strong growth as a well-respected, advanced small arms manufacturer."

39. The October 8, 2013 press release further quoted Airtronic's President and Chairman, Kett, attributing to her the quote that "We're thrilled to be able to announce this substantial OEM agreement so soon after the court confirmed our reorganization plan…. This exclusive OEM agreement is a testament to the world-class quality of our products…."

40. Airtronic never had a $95 million OEM contract for grenade launchers.

41. In a filing in the Adversary Proceeding, Kett stated that the quote attributed to her in the press release was invented.

42. The October 8, 2013 press release listed Defendants Delgado and R. Sullivan as contact persons regarding the substance of the press release.

---

[2] The October 8, 2013 press release is attached hereto as Exhibit B.

43. Following the publication of the October 8, 2013 press release, and announcement of the supposed $95 million contract, Global Digital's stock rose 7.6%, on volume triple that of the day before.

44. On October 11, 2013, Defendants issued another press release announcing the SEC's completion of its review of the Company's Form 10 Registration Statement. The title of the release further announced, "Continuing GDSI's Recent Momentum, this Announcement Comes Soon After GDSI's Planned Merger Partner, Airtronic USA, Inc., Signed OEM Supplier Agreement with a First Stage Value of Approximately $95 Million."[3] The body of the release again quoted Defendant R. Sullivan as saying that "[t]his news is especially welcome coming so soon after two other important developments: our October 8, 2013 announcement that Airtronic has become the exclusive OEM supplier for a major international client with a first stage value of Approximately $95 million…."

45. The October 11, 2013 press release listed Defendants Delgado and R. Sullivan as contact persons regarding the substance of the press release.

46. Following the October 11, 2013 press release, Airtronic President Kett learned of Global Digital's claims regarding the supposed $95 million contract when one of Airtronic's most important suppliers called to congratulate her on the $95 million contract. Global Digital had not supplied Kett with a copy of any press release before its publication, a violation of a covenant under the Merger agreement. On October 15, 2013, Kett emailed Defendant R. Sullivan, with the subject line "Re: $95 million OEM agreement." The email was filed in the Adversary Proceeding. Kett expressed her bewilderment and her knowledge that no such contract existed, writing "I just got a call from Bender who referred me to the GDSI press release

---

[3] The October 11, 2013 press release is attached hereto as Exhibit C.

about a $95 million OEM agreement. What agreement is this?" That same day, Defendant R. Sullivan responded, emailing "Hi. I would not respond to Bender about it. Let's talk when I get into town. Dick."[4] In a filing in the Adversary Proceeding, Kett wrote that she "since pressed Mr. Sullivan for an explanation with no response."

47. Six days later, on October 21, 2013, Defendants issued another press release announcing the signing of an investment banking advisor.[5] In the body of the release, the Company again touted the non-existent contract, despite Kett, herself, having informed Defendants on October 15 that there was no such contract. The press release read, in part, "we announced on October 8, 2013, that our planned merger partner Airtronic USA has become the exclusive OEM supplier for a major international client with a first stage value of approximately $95 million."

48. The October 21, 2013 press release listed Defendants Delgado and R. Sullivan as contact persons regarding the substance of the press release.

49. Following issuance of the October 21, 2013 press release, and announcement, for the third time, of the non-existent $95 million contract, Global Digital's stock rose 12%, on volume 62% higher than the previous trading day.[6]

50. On November 25, 2013, Airtronic President Kett filed a Declaration, with exhibits (the "Kett Declaration"), in the Adversary Proceeding, revealing for the first time publicly that Airtronic's $95 million contract was not real and that Kett did not make any statements touting this supposed exclusive contract.

---

[4] The October 15, 2013 emails are attached hereto as Exhibit D.

[5] The October 21, 2013 press release is attached hereto as Exhibit E.

[6] Global Digital later removed reference to the $95 million contract from the October 21, 2013 press release posted on its website. *See* http://www.gdsi.co/page49.html.

51. Furthermore, the Kett Declaration stated that on October 15, 2013, Defendant Loppert stated that Global Digital would not have ATF or DCMA approval, and that these requirements would have to be waived. However, Defendants knew that the Merger agreement approved by the bankruptcy court required that any transactions contemplated by the Merger agreement would have to be approved by ATF, DCMA and other governmental authorities charged with licensing or overseeing products sold by Airtronic and this critical condition precedent was required to be fulfilled "at, prior to, or contemporaneously with the Closing."

52. According to the Airtronic Answer, filed in the Adversary Proceeding, "GDSI [Global Digital] firmly [was] in control of Airtronic's finances, payroll and rent obligations accruing," therefore all statements Defendants made regarding the Airtronic $95 million contract were knowingly or recklessly false.

53. On November 26, 2013, shares of Global Digital stock fell 17.6%.

54. On December 2, 2013, due to the failure of Airtronic and Global Digital to complete the Merger, Airtronic reverted back to a debtor in possession under Chapter 11 of the U.S. Bankruptcy Code.

55. On December 2, 2013, Global Digital's stock fell by 11.1%, on immense trading volume of 304,600 shares.

56. The SEC Complaint baldly states that the $95 million "agreement never existed," and that Airtronic only had a contract for grenade launchers worth $300,000. The SEC Complaint further states that Kett "repeatedly requested Global Digital to remove these misleading statements from Global Digital's website."

57. According to the SEC Complaint, Airtronic President Kett cited Global Digital's refusal to remove the claim about the $95 million contract from its website as "one of the reasons

why Airtronic terminated its agreement with Global Digital."

58. On January 16, 2014, Airtronic filed a list of open orders and a chart of projected revenue with the bankruptcy court. The total value of all open orders was just shy of $1.3 million, and did not include any $95 million orders.

**Airtronic Current Open Orders**

| Buyer | Contract or Order Number | Quantity | Item Description | Invoice Amount |
|---|---|---|---|---|
| USG | W52H0910D0173 - DO 10 | 720 | M203A2 Grenade Launchers | $660,960.00 |
| USG | W52H0910D0173 - DO 11 | 335 | M203A2 Grenade Launchers | $307,530.00 |
| USG | W52H0910D0173 - DO 12 | 21 | M203A2 Grenade Launchers | $19,278.00 |
| Private | PO 47833 | 350 | M203A1 Grenade Launchers | $308,934.50 |
| | | | | |
| | Total Units | 1,426 | Total Receivable | $ 1,296,702.50 |

**Airtronic Proposed Shipping Schedule**

| Order | Scheduled Shipment Date | | Actual Shipment Date | Revenue | Terms |
|---|---|---|---|---|---|
| DO 10 | 50 launchers - 12/10/13 | | 12/10/2013 | $ 45,900.00 | Net 30 |
| PO 47833 | 150 launchers - Week of 12/16 | | | $ 132,400.50 | Net 10 |
| PO 47833 | 100 launchers - Week of 12/23 | | | $ 88,267.00 | Net 10 |
| PO 47833 | 100 launchers - Week of 12/30 | | | $ 88,267.00 | Net 10 |
| DO 10 | 288 launchers - 1/16/14 | | | $ 264,384.00 | Net 30 |
| DO 10 | 288 launchers - 1/27/14 | | | $ 264,384.00 | Net 30 |
| DO 10 & DO 12 | DO 10 94 and DO 12 21 launchers - 2/3/14 | | | $ 105,570.00 | Net 30 |
| DO 11 | 335 launchers 2/18/14 | | | $ 307,530.00 | Net 30 |
| | Total Units | 1,426 | Total Invoiceable | $ 1,296,702.50 | |

59. Global Digital never told investors that its press releases of October 8, 11, and 21 were false.

***<u>Global Digital's November 2013 Revenue Forecast for the First Quarter of 2014</u>***

60. On November 15, 2013, Global Digital issued a press release entitled "Global Digital Solutions, Inc., Offering Additional Details to the Public About Strategic Plans and Expected Near-Term Results, Anticipates Several Targeted Acquisition Agreements in the Fourth Quarter of 2013 and an Annual Revenue Run Rate Between $60 Million and $75 Million During the First Quarter of 2014."[7] The release stated that "during the fourth quarter of 2013,

[7] The November 15, 2013 press release is attached hereto as Exhibit F.

GDSI expects to be able to announce several agreements regarding potential acquisitions that fit into the company's targeted global growth strategy." Further, the Company stated that "[t]aking into account GDSI's various lines of business and assuming these additional strategic acquisitions move forward as expected, the company now anticipates that if it closes the potential acquisitions, it may achieve an annual revenue run rate between $60 million and $75 million during the first quarter of 2014."

61. A $60 million to $75 million annual revenue run rate equates to a projection of between $15 million to $18.75 million in revenue during the first quarter of 2014.

62. According to the SEC's "Order Instituting Administrative Proceedings" in *In the Matter of David A. Loppert*, File No. 3-317753,[8] Defendant Loppert "reviewed and edited" the press release concerning the revenue projection, "in conjunction with Defendants Global Digital and Global Digital's former Chairman and CEO," R. Sullivan. According to the same order, the press release "affected the stock's trading price and volume."

63. As of November 15, 2013, Global Digital did not have any lines of business, much less "various lines of business."

64. As of November 15, 2013, Global Digital owned no businesses whatsoever, and, according to the 2013 10-K, had $0 in revenue, so any acquisitions would not be "***additional*** strategic acquisitions."

65. According to the 2013 10-K, Global Digital had only $509,224 in cash and cash equivalents during the fourth quarter of 2013, insufficient to finance any acquisitions in the fourth quarter of 2013.

66. According to the 2013 10-K, signed by Defendants Delgado, Loppert, R. Sullivan,

[8] The "Order Instituting Administrative Proceedings" is attached hereto as Exhibit G.

Noterman, and S. Sullivan, Global Digital had no credible financing in place for any acquisitions. Indeed, in the 2013 10-K, under the heading "Financial Condition," the Company admits that it does not have available cash to sustain its then-existing operations, much less finance acquisitions, writing: "We do not have a line of credit facility and have relied on short-term borrowings and the sale of common stock to provide cash to finance our operations. We believe that we will need to raise additional capital in 2014 to sustain our operations. We plan to seek additional equity and debt financing to provide funding for operations."

67. According to the SEC Complaint, Global Digital only undertook financial due diligence on one company after issuing the November 15, 2013 press release.

68. In the SEC Complaint, the SEC calls Global Digital's revenue projections "false and misleading," and issued "without basis."

69. Global Digital never acquired any companies in the fourth quarter of 2013.

70. According to the 2013 10-K, filed on March 28, 2014, the Company missed its revenue projection, earning $0 in the first quarter of 2014, and not $15 million to $18.75 million during the first quarter of 2014.

71. On this news, shares of Global Digital fell $0.10 per share, or over 16%, over the next two days to close at $0.51 per share on April 1, 2014, further damaging investors.

72. On March 30, 2015, Global Digital filed its annual report on Form 10-K for the year ending December 31, 2014 (the "2014 10-K") with the SEC. The 2014 10-K reported revenues of $695,022 for the year ended December 31, 2014 – hardly close to the $60 million to $75 million range the Company projected. The 2014 10-K was signed by Defendants Loppert, Delgado, R. Sullivan, Noterman, and S. Sullivan.

73. Upon the filing of the 2014 10-K, Global Digital's stock price fell over 9%.

***Global Digital's March 11, 2014 and March 12, 2014 Press Releases Regarding Remington***

74. On March 11, 2014, Global Digital issued a press release, filed with the SEC on a Form 8-K, entitled "Global Digital Solutions Files Form 8-K, Announces Unsolicited Letter of Intent to Acquire Remington Outdoor Company, with Estimated Annual Sales of $1.25 Billion and a Purchase Price of Approximately $1.082 Billion."[9] The Form 8-K, signed by Defendant R. Sullivan, announced that on January 27, 2014 Global Digital had made an unsolicited bid to acquire Remington, for over $1 billion and, having received no response from Remington, the offer expired on February 17, 2014, but that Global Digital had revised its offer and submitted a non-binding proposal to Remington on March 10, 2014.

75. The March 11, 2014 8-K further announced that the Company had entered into two separate letters of intent with unnamed companies. The acquisition price for the first company was estimated, by Global Digital, to be $15.62 million. The acquisition price for the second company was estimated to be $30 million, of which $24 million would be cash and $6 million would be stock.

76. The March 11, 2014, press release quoted Defendant R. Sullivan saying "the GDSI team is extremely excited and confident about all three of these proposed acquisitions," and "In this dynamic environment, we see enormous opportunity to consolidate this market with a program of targeted acquisitions, including the proposed [Remington] transaction."

77. On March 12, 2014, Global Digital issued a corrected Form 8-K, signed by Defendant Loppert, and press release.[10] The only correction was that the $1.082 billion offer to

---

[9] The March 11, 2014 press release and 8-K are attached hereto as Exhibit H.

[10] The March 12, 2014 press release and 8-K are attached hereto as Exhibit I.

purchase Remington, would largely, rather than completely, be paid for in cash, with a smaller portion to be paid in stock.

78. According to the "Order Instituting Administrative Proceedings" in *In the Matter of David A. Loppert*, File No. 3-317753, Defendant Loppert "reviewed and edited" the press releases concerning the Remington offer, "in conjunction with Defendants Global Digital and Global Digital's former Chairman and CEO," R. Sullivan. According to the same Order, the press release "affected the stock's trading price and volume."

79. After the March 11 and 12 press releases, Global Digital's stock price rose by 21%.

80. On March 12, 2014, at the close of trading, Bloomberg and other news outlets acquired and reported on an internal memo Remington sent to its employees, quoting Remington CEO George Kollitides, dismissing the potential sale of Remington, which stated in part:

> A small, unknown investment entity publicly announced its desire to acquire the Remington Outdoor Company.... If this wasn't disruptive to our employees and customers, we would not acknowledge the news and recognize it for what it is: a publicity stunt from an agenda-driven group with no credible financing options.

81. In the two days following the publication of Remington's rejection of Global Digital and its offer, the Company's stock price fell over 15%.

82. Despite Remington's unequivocal, public rejection of Global Digital's offers, on March 28, 2014, in the 2013 10-K, signed by Defendants Delgado, R. Sullivan, Loppert, Noterman, and S. Sullivan, the Company again repeated its offer to purchase Remington, and stated that it had "not received a response to this proposal. However, the Company intends to continue efforts to enter into discussions with a view to moving forward." Global Digital further mentioned the proposed acquisitions of the two unnamed companies.

83. According to the 2013 10-K, Global Digital had no credible financing in place for any acquisitions. Indeed, in the 2013 10-K, under the heading "Financial Condition," the Company admits that it does not have available cash to sustain its then-existing operations, much less finance acquisitions, writing: "We do not have a line of credit facility and have relied on short-term borrowings and the sale of common stock to provide cash to finance our operations. We believe that we will need to raise additional capital in 2014 to sustain our operations. We plan to seek additional equity and debt financing to provide funding for operations."

84. According to the Form 10-Q for the period ended March 31, 2014, filed with the SEC on May 9, 2014, Global Digital had only $271,776 in cash and cash equivalents in the first quarter of 2014, insufficient for any acquisitions, much less an acquisition requiring $1 billion in cash.

85. The Company's contention that Remington had not responded to its offers was false, as was laid out in the SEC Complaint. Defendants knew as early as January 2014 that Remington only wanted a fully-financed, cash-only deal. Defendants further knew that Global Digital's investment bank, which assisted in presenting the original offer to Remington, never attempted to find financing options for a Remington deal because the parties did not have a signed offer letter.

86. Further, Defendants had received various, consistent communications, relayed from an investment banker representing Remington's shareholders to Global Digital's investment banker, and then to Global Digital, that "Remington had no interest at all in Global Digital's offer," according to the SEC Complaint. Defendants were told, specifically, that Remington rejected the offer after the January 27, 2014 initial offer, and following the March 10,

2014 offer. This latter rejection was communicated to Defendants *before* Global Digital issued its 8-K on March 11, 2014.

87. The Company never again mentioned the unnamed companies it claimed it intended to purchase after March 28, 2014, in either documents filed with the SEC or in public statements or press releases.

***Defendants Use Artificially Inflated Stock for Specific Acquisitions***

88. Defendants targeted specific companies with the intention of using the artificially inflated stock to lessen the cost of acquisitions.

89. On June 18, 2014, Global Digital issued a press release announcing that it had entered into an agreement to acquire NACSV for 645,161 shares of stock as well as cash. According to the 2014 10-K, Consolidated Statement of Cash Flow, the Company used inflated stock worth $1,081,945, and $864,575 in cash, to pay for the acquisition. The press release announcing the acquisition stated, in relevant part:

> **Global Digital Solutions, Inc. (GDSI) Completes Acquisition of North American Specialty Vehicles, LLC (NACSV) - Leading Builder of Mobile Command/Communications and Specialty Vehicles for Emergency Management, First Responders, National Security and Law Enforcement Operations**
>
> PALM BEACH, Fla., June 18, 2014 /PRNewswire/ -- Global Digital Solutions, Inc. (OTCQB: GDSI), a company that is positioning itself as a leader in providing cyber arms manufacturing and complementary security and technology solutions, today announced the acquisition of North American Custom Specialty Vehicles, LLC (NACSV), a leading builder of mobile command/communications and specialty vehicles for emergency management, first responders, national security and law enforcement operations.
>
> In 2013, NACSV generated revenue of $6.2 million and EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) of $1.06 million and has an expected revenue run rate of between $12 million and $14 million and expected EBITDA of between $2.1 million and $2.4 million by December 31, 2014.

> "We're delighted to announce the acquisition of NACSV," said GDSI's President and CEO Richard J. Sullivan. "NACSV is a well-respected builder of security and crisis management-related specialty vehicles. Very importantly, NACSV has an established client base and a skilled management team. The company's advanced command and control and emergency communications capabilities fit perfectly into GDSI's global growth strategy. We're looking forward to working together with the NACSV team in the months ahead."
>
> On June 16, 2014, GDSI's wholly owned subsidiary, GDSI Acquisition Corporation, entered into an Equity Purchase Agreement with the members of NACSV to acquire their interests in NACSV in consideration for $1 million in cash ***and 645,161 shares of GDSI's restricted common stock at closing on June 16, 2014*** and up to an additional $2.4 million of contingent consideration, payable either in shares of GDSI's common stock, or in cash, through December 31, 2017, as certain milestones and targets are met.
>
> (Emphasis added).

90. Following the announcement of the NACSV acquisition, Global Digital's stock rose over 21%, to close at $0.40 on June 18, 2014.[11]

91. On October 19, 2015, after the market closed, Global Digital filed a Form 8-K with the SEC, announcing that effective October 13, 2015, the Company had entered into an agreement to purchase Rontan, a Brazilian company, and one of the largest manufacturers and

[11] Eventually, NACSV's owners, Brian A. Dekle and John Ramsay, realized that they had accepted artificially inflated stock, and brought suit against Global Digital and R. Sullivan. *See Dekle, et. al. v. Global Digital Solutions, Inc. et. al.*, Case No. 05-CV-2015-9000050 (the "NACSV Lawsuit") and *Ramsey, et al., v. Global Digital Solutions, Inc., et al.*, 1:17-cv-000063 (the "NACSV Lawsuit II"), currently pending in the U.S. District Court for the Southern District of Alabama. In the NACSV Lawsuit, Dekle and Ramsey demanded cash consideration in the amount of $406,000, claiming that they would not have accepted Global Digital stock as consideration for the sale if they had known Defendants had artificially inflated the stock price. The first lawsuit was dismissed upon a settlement without prejudice, with leave to refile. In the NACSV Lawsuit II, filed on February 2, 2017, plaintiffs raise the same claims, alleging that Global Digital and Defendant R. Sullivan induced Ramsey and Dekle to agree to accept artificially inflated Global Digital stock in lieu of cash, stock inflated through fraudulent actions such as the Remington allegations raised in the instant case.

distributors of specialty vehicles.[12] Rontan agreed to accept $26 million in inflated Global Digital stock as part of the consideration. The Form 8-K states, in relevant part:

> **<u>Item 1.01 Entry into a Material Definitive Agreement</u>**
>
> Effective October 13, 2015, Global Digital Solutions, Inc., ("GDSI") a New Jersey corporation (as "Purchaser") entered into a Share Purchase and Sale Agreement (the "SPSA") dated October 8, 2015 with Joao Alberto Bolzan and Jose Carlos Bolzan, both Brazilian residents (collectively, the "Sellers") and Grupo Rontan Electro Metalurgica, S.A., a limited liability company duly organized and existing under the laws of Federative Republic of Brazil ("Rontan") (collectively, the "Parties'), pursuant to which the Sellers agreed to sell 100% of the issued and outstanding shares of Rontan to the Purchaser on the closing date.
>
> Rontan is engaged in the manufacture and distribution of specialty vehicles and acoustic/visual signaling equipment for the industrial and automotive markets.
>
> ***The purchase price shall consist of a cash amount, a stock amount and an earn-out amount*** as follows: (i) Brazilian Real ("R") $100 million (approximately US$26 million) to be paid by the Purchaser in equal monthly installments over a period of forty eight (48) months following the closing date; ***(ii) an aggregate of R$100 million (approximately US$26 million) in shares of the Purchaser's common stock, valued at US$1.00 per share***; and (iii) an earn-out payable within ten business days following receipt by the Purchaser of Rontan's audited financial statements for the 12-months ended December 31, 2017, 2018 and 2019. The earn-out shall be equal to the product of (i) Rontan's earnings before interest, taxes, depreciation and amortization ("EBITDA") for the last 12 months, and (ii) twenty percent and is contingent upon Rontan's EBITDA results for any earn-out period being at least 125% of Rontan's EBITDA for the 12-months ended December 31, 2015. It is the intention of the parties that the stock amount will be used by Rontan to repay institutional debt outstanding as of the closing date.
>
> (Emphasis added).

92. On the announcement of the acquisition agreement with Rontan, the price of Global Digital shares rose almost 186% to close at $.004, on unusually heavy trading volume.[13]

---

[12] Global Digital's agreement with Rontan is attached hereto as Exhibit J.
[13] As with the NACSV owners, Rontan eventually soured on the Defendants. On April 8, 2016, after the market closed, Global Digital filed a Form 8-K announcing that the Rontan owners were calling off the sale. The 8-K stated in relevant part:

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

93. The Class Period begins on October 8, 2013, when Defendants issued a press release, entitled "Global Digital Solutions' Planned Merger Partner, Airtronic USA, Becomes Exclusive OEM Supplier for a Major International Client Under a Private Label Agreement With an Estimated First Stage Value of Approximately $95 Million," claiming that Airtronic had a $95 million OEM supply contract for grenade launchers, containing a quote supposedly uttered by Airtronic President Kett touting the supposed $95 million supply contract.

94. On October 11, 2013, Defendants issued a second press release, subtitled "Global Digital Solutions' Planned Merger Partner, Airtronic USA, Becomes Exclusive OEM Supplier

---

> **Item 8.01 Other Events.**
>
> As previously disclosed, effective October 13, 2015, Global Digital Solutions, Inc., ("GDSI") a New Jersey corporation entered into a Share Purchase and Sale Agreement (the "SPSA") dated October 8, 2015 with Joao Alberto Bolzan and Jose Carlos Bolzan, both Brazilian residents (collectively, the "Sellers") and Grupo Rontan Electro Metalurgica, S.A., a limited liability company duly organized and existing under the laws of Federative Republic of Brazil ("Rontan"), pursuant to which the Sellers agreed to sell 100% of the issued and outstanding shares of Rontan (the "Rontan Securities") to GDSI on the closing date. As disclosed under the SPSA, the closing was subject to specific conditions to closing, which were waivable by GDSI.
>
> GDSI believes that it has satisfied or otherwise waived the conditions to closing and on April 1, 2016 advised the Sellers of its intention to close the SPSA and demanded delivery of the Rontan Securities. ***The Sellers, however, have notified GDSI that they intend to terminate the SPSA.*** GDSI believes that the Sellers have no right to terminate the SPSA and that notice of termination by the Sellers was not permitted under the terms of the SPSA. GDSI has engaged U.S. and Brazilian counsel to enforce GDSI's rights and remedies under the SPSA and applicable law, including, but not limited to injunctive relief, specific performance and damages and repayment of expenses associate with the enforcement of the provisions of the SPSA. (Emphasis added).

On the news of the cancellation of the Rontan acquisition, shares of Global Digital fell $0.01 or 50% to close at $0.01 on April 11, 2016.

for a Major International Client Under a Private Label Agreement With an Estimated First Stage Value of Approximately $95 Million," containing the identical claim about the $95 million contract.

95. On October 21, 2013, Defendants issued a third press release, again containing the identical claim about the $95 million contract.

96. For the following reasons, the foregoing statements and omissions were materially false and misleading: Defendants knew or were reckless in not knowing, and failing to disclose, that, as described in ¶¶3, 27-59:

a. Airtronic had no $95 million OEM contract for grenade launchers, and only slightly less than $1.3 million in total outstanding orders for all products;

b. Global Digital failed to remove these misleading statements from its website despite repeated requests to do so from Kett, the President and Chairman of Airtronic;

c. Kett never spoke the quote attributed to her in the October 8, 2013 press release, nor did she have any knowledge of a $95 million supply contract;

d. Global Digital was in control of Airtronic's finances when all three press releases were issued;

e. As a result, Defendants' statements and omissions about Global Digital's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

97. On November 15, 2013, Global Digital issued a press release disclosing its expected near-term results and anticipating several acquisitions, which stated in relevant part:

> **Global Digital Solutions, Inc., Offering Additional Details to the Public About Strategic Plans and Expected Near-Term Results, Anticipates Several**

**Targeted Acquisition Agreements in the Fourth Quarter of 2013 and an Annual Revenue Run Rate Between $60 Million and $75 Million During the First Quarter of 2014**

*Today's announcement continues company's ongoing effort to keep the public apprised of important developments in implementing global growth strategy as outlined in the President and CEO's Open Letter released on October 29, 2013*

PALM BEACH, Fla., Nov. 15, 2013 /PRNewswire/ -- Global Digital Solutions, Inc. (GDSI), a company that is positioning itself as a leader in providing cyber arms manufacturing, complementary security and technology solutions and knowledge-based, cyber-related, culturally attuned social consulting in unsettled areas, today offered additional details about the company's strategic plans and expected near-term results.

***During the fourth quarter of 2013, GDSI expects to be able to announce several agreements regarding potential acquisitions that fit into the company's targeted global growth strategy.*** It goes without saying that these agreements will be subject to due diligence and financing approval.

Taking into account GDSI's various lines of business and assuming these additional strategic acquisitions move forward as expected, the company now anticipates that if it closes the potential acquisitions, it may achieve ***an annual revenue run rate between $60 million and $75 million during the first quarter of 2014***.

Today's announcement continues the company's ongoing effort to keep the public apprised of all important developments related to implementing GDSI's global growth strategy as outlined in the Open Letter from Richard J. Sullivan, GDSI's President and CEO, on October 29, 2013. The entire Open Letter to the Public is available on GDSI's website at http://gdsi.co/rjs_open_letter.html.

"We're making this additional information publicly available in the interests of fairness and complete transparency," said Richard J. Sullivan, GDSI's President and CEO. "We believe it's important to let everyone know what actions we're taking to implement our strategy, which I outlined in my Open Letter recently. We're actively engaged in several exciting, strategically significant discussions that we believe will come to fruition in the fourth quarter of 2014. Taking everything into account, ***we now expect GDSI to achieve an annual revenue run rate of between $60 million and $75 million in the first quarter of next year***. This is very important information and we believe we have an obligation to publicly disclose our plans and expectations."

(Emphasis added).

98. For the following reasons, the foregoing statements and omissions were materially false and misleading: Defendants knew, as described in ¶¶4, 60-73, that:

a. The Company had no reasonable basis for its revenue projection;

b. The Company had no credible financing in place to effectuate any acquisitions;

c. The Company lacked sufficient cash to effectuate any acquisitions;

d. The Company lacked sufficient funds to even fund its basic operations, much less effectuate acquisitions;

e. Defendants Delgado and R. Sullivan, who according to the Company were in charge of "business development," were aware that Global Digital had no revenue-producing businesses, or any businesses whatsoever;

f. As a result, Defendants' statements and omissions about Global Digital's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

99. On both March 11, 2014 and March 12, 2014, Defendants filed a Form 8-K, each attaching a press release, announcing an offer to buy Remington for over $1 billion, and two unnamed companies for at least $45 million in cash. Defendant R. Sullivan was quoted as stating that "the GDSI team is extremely excited and confident about all three of these proposed acquisitions," and "In this dynamic environment, we see enormous opportunity to consolidate this market with a program of targeted acquisitions, including the proposed [Remington] transaction." The Forms 8-K, signed by Defendants R. Sullivan and Loppert, announced that Global Digital had previously, on January 27, 2014 made an unsolicited bid to acquire Remington, for over $1 billion and had not received a response to that earlier offer. Defendants

further announced in the filed documents and press releases that Remington had not responded to its offer of March 10.

100. On March 28, 2014, in the 2013 10-K, signed by Defendants Delgado, Loppert, R. Sullivan, Noterman, and S. Sullivan, Defendants repeated the details of the three offers, and stated that Global Digital had "not received a response to this [March 10, 2014] proposal. However, the Company intends to continue efforts to enter into discussions with a view to moving forward."

101. For the following reasons, the foregoing statements and omissions were materially false and misleading: Defendants knew, or were reckless in not knowing, and failing to disclose, that, as described in ¶¶5, 74-87:

a. Remington had specifically, and on multiple occasions, rejected Global Digital's offers, including after i) January 27, 2014 and before March 10, 2014; ii) between March 10, 2014 and the Company's issuance of the 8-K and press releases on March 11, 2014 and March 12, 2014; and iii) after March 12, 2014 and before March 28, 2014;

b. The Company had barely any cash, and no credible financing options, to complete any acquisition, whether for $15 million or $1 billion;

c. The Company lacked sufficient funds to even fund its basic operations, much less effectuate acquisitions;

d. As a result, Defendants' statements and omissions about Global Digital's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

102. On August 11, 2016, the SEC Complaint was filed against Defendants Global Digital, R. Sullivan, and Loppert. The SEC Complaint charged Defendants with multiple counts of securities fraud, including charges related to the non-existent Airtronic $95 million contract, the knowingly false revenue forecast for the first quarter of 2014, and the documents announcing Global Digital's Remington offers, and the intention to complete other acquisitions.

103. The filing of the SEC Complaint was the first time the public became aware of an SEC investigation into Global Digital and any of its officers. The SEC Complaint revealed, for the first time, the full truth of Global Digital's continuing scheme to raise the price artificially of its worthless stock, despite the absence of any working businesses or revenue, in order to use the inflated stock for acquisitions. The SEC Complaint laid bare Global Digital as an empty shell, and pulled back the curtain on the extent of Defendants' fraud.

104. Specifically, the SEC complaint charged:

a. Global Digital falsely stated in its October, 2013 press releases that Airtronic had a $95 million exclusive OEM contract for sophisticated grenade launchers, when in fact Airtronic had no such contract.

b. Kett, the President and Chairman of Airtronic repeatedly requested Global Digital remove the press releases issued in October 2013 from Global Digital's website. Global Digital's failure to remove or correct these false press releases was specifically cited as one of the reasons why Airtronic terminated its merger agreement with Global Digital.

c. Global Digital only had $509,224 in cash during the fourth quarter of 2013, and had no credible financing in place to finance any acquisitions, and thus had no reasonable basis to project an annual revenue run rate of between $60

million to $75 million for the first quarter of 2014 in its November 15, 2013 press release.

d. Global Digital had less than $272,000 in cash during the first quarter of 2014, and had no credible financing in place to finance any acquisitions, and thus had no prospect of financing the purchase of Remington, or the two other intended acquisitions.

e. As early as January 2014, Defendants R. Sullivan and Loppert knew that Remington only wanted a fully-financed, cash-only deal.

f. Defendants R. Sullivan and Loppert knew that Remington had repeatedly rejected its acquisition offer, and knew these facts before repeatedly stating, publicly, that Remington had not responded to Global Digital's offer.

105. Throughout the Class Period, Global Digital stock was worthless.

106. Each of the Defendants charged in the SEC Complaint has either settled the claims, agreeing to cash fines and permanent injunctions, or filed its intent to do so.

107. On December 20, 2016, a "Final Judgment as to Defendant Loppert" was filed in the SEC action (the "Loppert Judgment"), stating that Loppert would pay a civil of $90,000, was barred from acting as an officer or director of any issuer, or trading in any penny stock, and that for purposes of exceptions to discharge under the Bankruptcy Code, "the allegations in the complaint are true and admitted by Defendant."[14]On December 27, 2016, the SEC issued an "Order Instituting Administrative Proceedings" in *In the Matter of David A. Loppert*, File No. 3-317753, in which the SEC deemed it "appropriate and in the public interest" to impose sanctions on Defendant Loppert.

---

[14] The Loppert Judgment is attached hereto as Exhibit K.

108. On December 21, 2016, the SEC filed a Notice of Tentative Settlement Agreements in the SEC action ("December Tentative Settlement"), stating that a tentative agreement had been reached between the SEC, on the one hand, and Global Digital and R. Sullivan, on the other.[15] This tentative settlement agreement would be effective upon Defendants R. Sullivan and Global Digital "executing the proposed Consents," "placing the requisite agreed upon amount of money in escrow by agreed upon dates certain," and the three-member Commission in Washington, D.C. approving the settlement recommendations."

109. On March 7, 2017, the SEC filed its "Notice of Filing Consent for Defendant Global Digital as well as the Requests for Entry of Judgment or Permanent Injunction and Other Relief." This filing included the settlement agreement between the SEC and Global Digital, entered into by Defendant Delgado on behalf of the Company.[16] The SEC noted that Global Digital had failed "to meet a contingency" regarding "disgorgement and civil penalty" listed in the December Tentative Settlement, i.e., Global Digital had failed to deposit the "agreed upon amount of money in escrow by agreed upon dates certain." Therefore, the parties agreed on the issue of liability, and bifurcated the issues of disgorgement and civil penalties. Pursuant to the filed Consent, Global Digital agreed to "disgorgement of ill-gotten gains" and "a civil penalty," as well as to being permanently enjoined from violations of the securities laws.

110. The March 7, 2017 filing also apprised the public that Defendant R. Sullivan had met the three requirements outlined in the December Tentative Settlement, but the SEC was in the process of seeking Commission approval. If approval is granted, the SEC expects to file R. Sullivan's consent and a proposed final judgment within approximately thirty days therefrom.

---

[15] The December Tentative Settlement is attached hereto as Exhibit L.

[16] The Notice of Filing Consent and Settlement Agreement are attached hereto as Exhibit M.

111. On March 14, 2017, final "Judgment As to Defendant Global Digital Solutions, Inc." was filed in the SEC action. The Order requires Global Digital to disgorge all ill-gotten gains, pay pre-judgment interest thereon, and pay a civil penalty.[17]

## ADDITIONAL SCIENTER ALLEGATIONS

112. As alleged herein, Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Global Digital, his/her control over, and/or receipt and/or modification of Global Digital's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Concordia, participated in the fraudulent scheme alleged herein.

113. Defendants used the artificially inflated stock price to raise funds, thereby lessening the costs of acquisitions. According to the 2013 10-K, in 2013 Global Digital sold 5,634,000 shares of common stock in private placements to accredited investors for gross proceeds of $2,011,100. In addition to private placement agreements, Global Digital closed on a loan and exercised warrants, and with the private placement, the Company receiving gross proceeds of $3,186,100.

[17] The Global Digital Judgment is attached hereto as Exhibit N.

114. After the October, 2013 press releases containing the false statements about the Airtronic's supposed $95 million contract, the 2013 10-K revealed that Global Digital was raising additional funds from investors, stating in relevant part:

**Recent Sales of Unregistered Securities/Recent Purchase of Securities**

- On October 16, 2013, we issued a warrant to purchase 1,000,000 shares of our common stock at an exercise price of $1.00 per share to Midtown Partners, LLC, an investment banking company, for services to be rendered per an investment banking agreement.

- On October 16, 2013, we accepted subscriptions for a total of 100,000 shares of our common stock in a private placement from one investor. ***We received gross proceeds of $50,000.***

(Emphasis added).

115. The 2013 10-K also revealed that Global Digital used its artificially inflated stock to raise $50,000 from an investor in a private placement on November 11, 2013.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

116. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Global Digital publicly traded securities on the OTCQB exchange during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

117. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Global Digital securities were actively traded on the OTCQB exchange. While the exact number of Class members is unknown to Plaintiff at this

time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Global Digital or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

118. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

119. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

120. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Global Digital;

c. whether the Individual Defendants caused Global Digital to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of Global Digital securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

121. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

122. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. Global Digital securities are traded in an efficient market;

d. the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on an OTC exchange;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g. Plaintiff and members of the Class purchased, acquired and/or sold Global Digital securities between the time the Defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

123. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

124. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against All Defendants**

125. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

126. This cause of action is asserted against all Defendants.

127. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and/or sell Global Digital's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

128. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Global Digital as specified herein.

129. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Global Digital's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Global Digital and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers Global Digital securities during the Class Period.

130. Each of the Defendants' primary liability, and controlling person liability, arises from the following: (a) Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) by virtue of their responsibilities and activities as senior officers and/or directors of the Company, were privy to and participated in the creation, development and reporting of the Company's plans, projections and/or reports; (c) Defendants enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's, operations, and (d) Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

131. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Global Digital's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

132. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Global Digital's securities was artificially inflated during the Class Period.

133. In ignorance of the fact that market prices of Global Digital's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Global Digital's securities during the Class Period at artificially high prices and were damaged thereby.

134. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Global Digital's

financial results and condition, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Global Digital securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

135. By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

136. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

137. This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

138. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

139. This second cause of action is asserted against each of the Individual Defendants.

140. The Individual Defendants acted as controlling persons of Global Digital within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff

contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

141. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

142. As set forth above, Global Digital and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

143. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

144. This action was filed within two years of discovery of the fraud and within five years of Plaintiff' purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

b. Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 21, 2017

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/Laurence M. Rosen*

Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 21st day of March 2017, a true and correct copy of Plaintiff's **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/Laurence M. Rosen*