**\*NOT FOR PUBLICATION\***

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

JEFF HULL, *on behalf of himself*
*and all those similarly-situated*,

                  Plaintiff,

v.

GLOBAL DIGITAL SOLUTIONS, INC.,
*et al.*,

                  Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

Civ. Action No. 16-5153(FLW)


**OPINION**

_____

**<u>WOLFSON, District Judge</u>:**

Lead Plaintiff Michael Perry[1] ("Plaintiff") brings this putative securities-class action, on behalf of himself and all other similarly situated individuals, against Global Digital Solutions, Inc. ("GDS" or the "Company"), a specialty-vehicle manufacturing company, as well as GDS's former Chief Executive Officer Richard J. Sullivan ("Sullivan"),[2] former Chief Financial Officer David Loppert ("Loppert"), former director and Executive Vice President William J. Delgado ("Delgado"), and former directors Arthur F. Noterman and Stephanie C. Sullivan (collectively "Individual Defendants") ("GDS" and "Individual Defendants" together referred to as "Defendants"), alleging violations under, *inter alia*, various provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and the rules promulgated thereunder. Plaintiff accuses Defendants of making false representations and omissions to artificially raise GDS's stock price

---

[1]     The Court appointed Mr. Perry as lead plaintiff on November 10, 2016.

[2]     Defendant Richard Sullivan has been served by Plaintiff, however, he has not answered or otherwise moved for dismissal. On the other hand, it does not appear that Defendants Arthur F. Noterman or Stephanie C. Sullivan were served with the Amended Complaint.

in an effort to finance specific acquisitions and raise cash using the inflated stock. In the instant

matter, Defendants GDS and Delgado move for dismissal on the basis that Plaintiff has failed to

adequately allege the elements of his securities claims. In addition, Defendant Loppert separately

moves to dismiss the Amended Complaint (collectively, the "Moving Defendants").[3] For the

reasons set forth below, the Moving Defendants' motions are **GRANTED**; however, in lieu of

dismissal, Plaintiff shall have leave to amend his Amended Complaint within 30 days from the

date of the Order accompanying this Opinion.

## BACKGROUND[4]

GDS is a company that builds mobile command/communications and specialty vehicles

for emergency management, first responders, national security, and law enforcement operations.

During all relevant periods, GDS's stock traded on the over-the-counter exchange, OTCQB, under

the ticker symbol "GDSI." *Id.* at ¶ 14. The class period is October 8, 2013 through August 11,

2016. During the class period, Loppert was GDS's Chief Financial Officer ("CFO") from August

12, 2013 through April 10, 2015; Delgado was responsible for GDS's business development and

served in various roles, such as, President, CEO, CFO, Chairman, and Executive Vice President;

and Sullivan was GDS's CEO from the start of the class period through May 13, 2016. Plaintiff

alleges that based on these individual defendants' roles in the Company, they participated in the

day-to-day management and operations of GDS at the highest level, were privy to confidential

---

[3]     The Court notes that while Defendant Loppert is represented by different counsel than
Defendants GDS and Delgado, they, nonetheless, submitted substantially similar briefings on their
motions to dismiss. As such, the Court will consider them in tandem.

[4]     The following allegations are taken from the Complaint and are assumed true for the
purposes of review under Rule 12(b)(6).

information, and were directly or indirectly involved in drafting, producing, reviewing, approving, and/or disseminating false and misleading statements to deceive investors. *Id.* at ¶¶ 17, 22, 112.

More specifically, Plaintiff alleges that during the class period, unbeknownst to investors, GDS's stock was "worthless." *Id.* at ¶ 2. In that regard, Plaintiff accuses Defendants of disseminating false and misleading statements, and participating in several schemes designed to artificially inflate the price of GDS's common stock. *Id.* In his Amended Complaint, Plaintiff sets forth various alleged "schemes" perpetuated by Defendants:

1. By way of press releases, Defendants misrepresented a failed merger with Airtronic USA, Inc. ("Airtronic"), *id.* at ¶ 3;

2. Defendants issued a misleading press release announcing that GDS "expects to announce several agreements regarding potential acquisitions," when in reality, Defendants knew GDS had neither the cash nor credible financing to acquire any company, *id.* at ¶ 4; and

3. Defendants falsely issued press releases in March 2014, announcing an unsolicited bid to acquire, *inter alia*, Remington Outdoor Company, Inc. ("Remington") for over $1 billion in cash and stock, when, in fact, GDS had very little cash on hand, and no credible financing options, *id.* at ¶ 5.

The Court will detail each of these "schemes," in turn.

## I.    The Airtronic Press Releases

In March 2012, Airtronic, an arms manufacturer and distributor, was in bankruptcy proceedings in the United States Bankruptcy Court for the Northern District of Illinois. *Id.* at ¶ 29. Before and after Airtronic entered bankruptcy, Merriellyn Kett ("Kett"), the President of Airtronic, attempted to obtain an infusion of working capital in order to preserve Airtronic's

government contracts. *Id.* at. ¶ 30. In August 2012, Airtronic and GDS executed a letter of intent involving a prospective merger, wherein GDS agreed to furnish a bridge loan to Airtronic to sustain Airtronic's operations through confirmation of a plan of reorganization approving the merger and treatment of creditors' claims. *Id.* at ¶ 31. According to Plaintiff, based on their agreement, Defendants were firmly in control of Airtronic's finances, payroll, and rent obligations. *Id.* at. ¶ 52. On October 2, 2013, the Bankruptcy Court confirmed Airtronic's plan, and set a sixty day deadline, *i.e.*, December 2, 2013, for GDS and Airtronic to finalize the merger. *Id.* at. ¶ 37. However, according to Plaintiff, because, in part, GDS failed to fulfill its loan obligations under the merger agreement, the merger ultimately did not complete. *Id.* at ¶¶ 34, 57.

On October 8, 2013 (the start of the class period), Defendants issued a press release entitled, "Global Digital Solutions' Planned Merger Partner, Airtronic USA, Becomes Exclusive [Office of Emergency Management] Supplier for a Major International Client Under a Private Label Agreement with An Estimated First State Value of Approximately $95 Million." *Id.* at ¶ 38. The press release also quoted Kett as stating, "We're thrilled to be able to announce this substantial OEM agreement so soon after the court confirmed our reorganization plan . . . . This exclusive OEM agreement is a testament to the world-class quality of our products . . . ." *Id.* at. ¶ 39. Following publication of the October 8, 2013 press release, GDS's stock allegedly rose 7.6%. *Id.* at. ¶ 43.

Similarly, on October 11, 2013, Defendants again issued a press release touting the merger. Both Delgado and Sullivan were listed as the contact persons for the substance of this second press release. *Id.* at ¶ 45. Specifically, the release quoted Sullivan: "[t]his news is especially welcome coming so soon after two other important developments: our October 8, 2013 announcement that

Airtronic has become the exclusive OEM supplier for a major international client with a first stage value of approximately $95 million . . . ." *Id.* at. ¶ 44.

Plaintiff alleges that GDS had not supplied Kett with the a copy of the first two press releases before their publication, and that Kett eventually learned of the purported $95 million OEM contract that was touted by Defendants in the press. Thereafter, on October 15, 2013, Kett emailed Sullivan to inquire about the existence of the OEM contract; however, Kett, allegedly, never received an explanation regarding the contract.[5] *Id.* at. ¶ 46. Plaintiff alleges that, according to Kett, Airtronic's $95 million contract was "not real" and that Kett did not make any statements "touting this supposed exclusive contract." *Id.* at ¶ 50.

Six days after Kett questioned Sullivan about the OEM contract, Defendants issued, on October 21, 2013, a third press release allegedly repeating the false claim that "Airtronic USA has become the exclusive OEM supplier for a major international client . . . ." *Id.* at ¶ 47. Indeed, this press release, again, listed Delgado and Sullivan as contact persons regarding the substance of the press release. Following the issuance of the October 21, 2103 press release, GDS's stock rose 12%, on volume 62% higher than the previous trading day. *Id.* at. ¶ 49.[6]

Furthermore, Plaintiff avers that, according to Kett, Defendant Loppert informed Kett, on October 15, 2013, that GDS would not have the necessary governmental approval for the merger, and that any conditions or requirements set by the government would have to be waived; however, Defendants allegedly knew that the merger agreement would not be sanctioned by the Bankruptcy

---

[5]    The Court notes that Plaintiff's allegations regarding Kett's responses related to the GDS merger were taken from a declaration that Kett filed with the Bankruptcy Court in an Adversary Proceeding in November 2013.

[6]    According to Plaintiff, GDS later removed reference to the $95 million contract from the October 21, 2013 press release posted on its website. Am. Compl., ¶ 49, n.6.

Court, if the merger, itself, was not expressly approved by certain governmental agencies. *Id.* at. ¶ 51. Plaintiff alleges that because GDS was firmly in control of Airtronic's finances, payroll, and rent obligations, Defendants knew that the statements they made regarding the merger, as well as Airtronic's $95 million contact, were false. Indeed, according to Plaintiff, based on all the filings in the bankruptcy proceedings, Airtronic never identified any $95 million orders from the government. Plaintiff claims that, following the filing of the Kett declaration in the Adversary Proceeding, on November 26, 2013, shares of GDS's stock fell 17.6%, and, on December 2, 2013, after the public revelation that the GDS/Airtronic merger failed, GDS's stock fell further by 11.1%, on immense trading volume of 304,600 shares. *Id.* at. ¶¶ 53-55. Plaintiff alleges that GDS never told investors that the press releases of October 8, 11 and 21 were false. *Id.* at. ¶ 59.

## II.     GDS's November 2013 Revenue Forecast for the First Quarter of 2014

On November 15, 2013, GDS issued a press release entitled, "GDSI Solutions, Inc., Offering Additional Details to the Public About Strategic Plans and Expected Near-Term Results, Anticipates Several Targeted Acquisition Agreements in the Fourth Quarter of 2013 and an Annual Revenue Run Rate Between $60 Million and $75 Million During the First Quarter of 2014." *Id.* at. ¶ 60. The release stated that "during the fourth quarter of 2013, GDSI expects to be able to announce several agreements regarding potential acquisitions that fit into the company's targeted global growth strategy." *Id.* And, the Company touted that "[t]aking into account GDSI's various lines of business and assuming these additional strategic acquisitions moved forward as expected, the company now anticipates that if it closes the potential acquisitions, it may achieve an annual revenue run rate between $60 million and $75 million during the first quarter of 2014." *Id.* at. ¶ 60. Plaintiff alleges that Loppert and Sullivan "reviewed and edited" the press release concerning the revenue projection. *Id.* at ¶ 62. According to Plaintiff, that kind of revenue run rate would

yield between $15 million to $18.75 million in revenue during the first quarter of 2014.  *Id.* at ¶ 61.  Based on this news, Plaintiff claims that the press release positively "affected the stock's trading price and volume."  *Id.* at ¶ 62.

However, Plaintiff avers that, as of November 15, 2013, GDS did not have any lines of business, much less "various lines of business," and it did not own any business.  *Id.* at ¶¶ 63-64. Indeed, Plaintiff claims that based on GDS's 2013 10-K,[7] GDS had $0 in revenue and the Company had only $509,224 in cash or equivalents during the fourth quarter of 2013, which, according to Plaintiff, was insufficient to finance any acquisitions in the fourth quarter of 2013. *Id.* at ¶¶ 64-65.  Additionally, according to the 2013 10-K, which was filed on March 28, 2014, and signed by Delgado, Loppert and Sullivan, Noterman and Ms. Sullivan, GDS had no financing in place for any acquisitions.  In fact, the Company stated in the 10-K that it did not have available cash to sustain its then-existing operations.  *Id.* at. ¶ 66.  Plaintiff alleges that GDS, contrary to its press release, never acquired any companies in the fourth quarter of 2013.  *Id.* at. ¶ 69.  And, importantly, Plaintiff asserts that GDS missed its revenue projection, earning $0 in the first quarter of 2014, not the millions of dollars that Defendants had projected.  *Id.* at ¶ 70.  Plaintiff further alleges that, on this news, GDS's stock fell $0.10 per share, or over 16%, over the next two days to close at $0.51 per share on April 2014.[8]  *Id.* at. ¶ 71.

---

[7]  A form 10-K is an annual report required by the U.S. Securities and Exchange Commission ("SEC") that gives a comprehensive summary of a company's financial performance.

[8]  Plaintiff alleges that a year later, on March 30, 2015, GDS filed its annual report on Form 10-K for the year ending December 31, 2014, which revealed that GDS had made only approximately $695,000 for the full year of 2014 — "hardly close to the $60 million to $475 million range the Company projected."  Am. Compl., ¶ 72.

### III. GDS's Press Release Regarding Remington

On March 11, 2014, GDS issued a press release entitled, "GDS I Solutions Files Form 8-K [9] Announces Unsolicited Letter of Intent to Acquire Remington Outdoor Company, with Estimated Annual Sales of $1.25 Billion and a Purchase Price of Approximately $1.082 Billion." *Id.* at. ¶ 74. The press release announced that on January 27, 2014, GDS had made an unsolicited bid to acquire Remington, a large arms manufacturer, for over $1 billion. The release further stated that GDS did not receive a response from Remington, and so GDS revised its offer and submitted a non-binding proposal to Remington on March 10, 2014. *Id.* at. ¶ 74. The press release further claimed that the Company had entered into separate letters of intent to acquire two unnamed companies, the price of which would be over $45 million. *Id.* at. ¶ 75. The press release quoted Sullivan stating "the GDSI team is extremely excited and confident about all three of these proposed acquisitions," and "[i]n this dynamic environment, we see enormous opportunity to consolidate this market with a program of targeted acquisitions, including the proposed [Remington] transaction." *Id.* at. ¶ 76. The press release was signed and reviewed by Sullivan and Loppert. *Id.* at. ¶¶ 74, 77-78. Plaintiff claims that GDS's stock rose by 21% in response to the press release and 8-K. [10] *Id.* at. ¶ 78-79.

Plaintiff alleges that, on March 12, 2014, after the close of trading, an internal memo to employees from Remington's CEO, George Kollitides, was leaked; the memo rejected the news that Remington was being acquired by GDS. *Id.* at. ¶ 80. Specifically, the memo stated that the

---

[9]     Generally, a form 8-K is used to notify investors in publicly traded companies of specified events that may be important to shareholders.

[10]     On March 12, 2014, GDS issued a corrected Form 8-K and press release, correcting the previous March 11, 2014 press release. The correction made was that the $1.082 billion offer to purchase Remington, would largely, rather than completely, be paid for in cash, with a smaller portion to be paid in stock. Am. Compl., ¶ 77.

press release was a "publicity stunt from an agenda-driven group with no credible financing options." *Id.* On the heels of that leak, Plaintiff alleges that GDS's stock fell over 15%. *Id.* at. ¶ 81.

Plaintiff accuses Defendants of making false and misleading statements in their March 11 and 12 press releases. Specifically, Plaintiff claims that Remington had rejected GDS's offer to purchase before GDS filed its 8-K and its first press release on March 11, 2014. *Id.* at. ¶ 84. Indeed, Plaintiff avers that Remington's investment banker explicitly informed GDS that "Remington had no interest at all in GDSI's offer." *Id.* at. ¶ 86. In fact, Plaintiff alleges that Defendants knew as early as January 2014, that Remington would only pursue acquisition if the deal was a fully-financed, cash only deal, and that Defendants knew that GDS's own investment bank, which assisted in presenting the offer to Remington, never attempted to find financing options for a Remington deal. *Id.* at. ¶ 86. Plaintiff maintains that despite the repeated direct rejection by Remington, GDS publicly repeated its intention to purchase Remington, falsely claiming that it had "not received a response to [the acquisition] proposal. However, the Company intends to continue efforts to enter into discussions with a view to moving forward." *Id.* at. ¶ 82. Plaintiff further claims that GDS had no available financing in place for any acquisition, much less a $1 billion acquisition. *Id.* at. ¶¶ 63-64, 66, 83. Indeed, Plaintiff asserts that, according to GDS's Form 10-Q for the period ending March 31, 2014, filed with the SEC on May 9, 2014, GDS apparently had only $271,776 in cash or equivalents in the first quarter of 2014. *Id.* at. ¶ 84.

## IV.  Artificially Inflated Stock

Furthermore, Plaintiff avers that Defendants targeted specific companies intending to use the artificially inflated stock to lessen the cost of acquisitions. *Id.* at. ¶ 88. For example, Plaintiff alleges that, on June 18, 2014, GDS issued a press release announcing that it had entered into an

agreement to acquire North American Custom Specialty Vehicles, LLC ("NACSV"), paying for the acquisition, in part, with allegedly inflated stock worth $1,081,945. *Id.* at. ¶ 89. In response to this news, GDS's stock rose over 21%. *Id.* at. ¶ 90. NACSV later sued Defendants when they learned that the stock was artificially inflated. *Id.* at. ¶ 90 n.11. By way of another example, Plaintiff alleges that on October 19, 2015, after the market closed, GDS filed a Form 8-K, announcing that GDS had entered into an agreement to purchase Grupo Rontan Electro Metalurgica, S.A., a Brazilian Company, for a price that included $26 million in GDS's allegedly inflated stock, and based on this news, Plaintiff further alleges that GDS shares rose almost 186%. *Id.* at. ¶ 94. According to Plaintiff, on April 11, 2016, GDS shares fell 50% when the public learned that Rontan had cancelled the sale. *Id.* at. ¶ 92 n.13. In addition, Plaintiff avers that following the second allegedly false Airtronic press release, as noted above, GDS used its artificially inflated stock price to raise $50,000. *Id.* at. ¶¶ 114-115. Plaintiff submits that the Company raised an additional $2.01 million through private placement of inflated stock in 2013, alone. *Id.* at. ¶ 113.

## V. The SEC Complaint

On August 11, 2016, the SEC filed a civil Complaint charging Defendants GDS, Sullivan, and Loppert, with multiple counts of securities fraud, including claims related to the allegations involving the Airtronic $95 million contract, the allegedly knowingly false revenue forecast for the first quarter of 2014 made by GDS in its press release, the documents announcing GDS's Remington offers, and the allegations concerning additional acquisitions. *Id.* at. ¶ 102. Upon this news, GDS shares dropped 52% on August 12, 2016.[11]

---

[11] While this particular statistic was not alleged in the Complaint, the Court takes judicial notice of the stock prices on August 11, 2016 and August 12, 2016, supplied by Plaintiff. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (finding that district court did not

Plaintiff alleges that only with the filing of the SEC Complaint did the public learn of an SEC investigation into GDS and its officers. *Id.* at. ¶ 103. According to Plaintiff, the SEC Complaint revealed,[12] for the first time, the full extent of Defendants' alleged schemes to artificially inflate the price of its stock, despite the absence of any working businesses or revenue, in order to use the inflated stock for acquisitions.[13] *Id.* at. ¶¶ 103-104.

Based on the above allegations, Lead Plaintiff brought this putative class action against Defendants, asserting two causes of action under the Securities Exchange Act: 1) violation of Section 10(b) against all Defendants; and 2) violation of Section 20(a) of the Securities Exchange Act against the Individual Defendants. In the instant matter, the Moving Defendants seek dismissal of Plaintiff's securities claims asserted in the Amended Complaint against them.

## DISCUSSION

### I. Standard of Review

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "[f]ailure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233

---

abuse its discretion with it took judicial notice of stock prices on a motion to dismiss, pursuant to Fed. R. Evid. 201(b)); *see also Ieradi v. Mylan Lab., Inc.*, 230 F.3d 594, 600 n.3 (3d Cir. 2000) (taking judicial notice of stock prices reported by Quotron Chart Services).

[12]    Indeed, the majority of the allegations asserted by Plaintiff in his Amended Complaint are largely derived from the SEC Complaint.

[13]    According to Plaintiff, each of the defendants charged in the SEC Complaint has either settled the claims, admitted the allegations were true and correct, and agreed to permanent injunctions and to pay cash fines, or filed a letter of intent to do so. Am. Compl., ¶¶ 105-111.

(3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when

there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

"Independent of the standard applicable to Rule 12(b)(6) motions," Fed. R. Civ. P. 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). To satisfy this heightened pleading standard, a plaintiff must state the circumstances of his alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200 (citing *Lum*, 361 F.3d at 224). Indeed, the Third Circuit has advised that, at a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 216).

In addition to Rule 9(b)'s heightened pleading requirements, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C § 78u *et seq.*, to require an even higher pleading standard for plaintiffs bringing private securities fraud actions. *In re Suprema, 438 F.3d at 276*. This heightened pleading standard is targeted at preventing abusive securities litigation.

*See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Private securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (identifying "ways in which the class-action device was being used to injure the entire U.S. economy" and listing examples such as "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent") (quotations and citations omitted).

The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u-4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u-4(b)(1)). Second, the complaint must, "with respect to each act or omission alleged to violate this [chapter], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Both provisions of the PSLRA require facts to be pled with "particularity." *Avaya*, 564 F.3d at 253. This particularity language "echoes precisely Fed. R. Civ. P. 9(b)." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999); *see* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."). Indeed, although the PSLRA replaces Rule 9(b) as the pleading standard governing private securities class actions, the rule's particularity requirement "is comparable to and effectively subsumed by the requirements of [§

78u-4(b)(1) of] the PSLRA." *Avaya*, 564 F.3d at 253 (citations omitted). This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *In re Advanta*, 180 F.3d at 534 (quotations marks omitted).

## II.     Section 10(b) of the Securities Exchange Act

The private right of action under Section 10(b) and Rule 10b-5 "creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). In relevant part, Rule 10b-5 makes it unlawful for an individual "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b) of the Securities Exchange Act and Rule 10b-5, the plaintiff must allege: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation." *Gold v. Ford Motor Co.*, 577 F. App'x 120, 122 (3d Cir. 2014) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

Here, the Moving Defendants argue that Plaintiff fails to state a claim for securities fraud under section 10(b) because: (a) Plaintiff's claims are time barred; (b) Plaintiff has not adequately alleged the requisite elements of economic loss, causation, reliance, or scienter; and (c) some of the challenged statements are forward-looking, and therefore, are protected by the Securities Exchange Act's safe harbor provision.  I will address each of these contentions in turn.

### A.     Statute of Limitations

The Moving Defendants argue that Plaintiff's § 10(b) claim is time barred. For support, the Moving Defendants cherry-pick certain allegations in Plaintiff's Amended Complaint to contend

that the statute of limitations has run. In that regard, the Moving Defendants point to two separate categories of allegations: first, in connection with his allegations pertaining to the Remington Acquisition, Plaintiff alleges that on March 12, 2014, Bloomberg and other news outlets acquired and reported on the internal memo Remington sent to its employees, wherein Remington's CEO disavowed the potential sale of Remington to GDS. Am. Comp., ¶ 80. In that regard, two days following the publication of such news, GDS's stock fell over 15%. *Id.* at ¶ 81. Next, unrelated to the Remington acquisition, the Moving Defendants rely on Plaintiff's allegations that GDS filed its 2013 10-K on March 28, 2014, disclosing that GDS missed its revenue projection, earning $0 in the first quarter of 2014. *Id.* at ¶ 70. Based on this disclosure, Plaintiff avers that shares of GDS stock fell $0.10 per share, or approximately 16%, over the next two days to close at $0.51 per share on April 1, 2014. *Id.* at ¶ 71. Based on these allegations, the Moving Defendants argue that, between March 12, 2014 and April 1, 2014, adverse publications resulted in dramatic drops in stock price, which establishes that the limitations period on the § 10(b) claim began to run no later than April 1, 2014, because a reasonably diligent plaintiff would have discovered the facts constituting the allegedly improper conduct underlying Plaintiff's § 10(b) claim at that time. I disagree.

For claims arising under 10(b) and Rule 10b-5, courts employ the statute of limitations applicable to federal civil actions involving claims of fraud or deceit. *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010); 28 U.S.C. § 1658. Under this statute, claims may not be brought later than either "2 years after the discovery of the facts constituting the violation;" or "5 years after such violation," whichever comes first. 28 U.S.C. § 1658(b); *Rabin v. Nasdaq Omx Phlx LLC*, 182 F. Supp. 3d 220, 236 (E.D. Pa. 2016). When determining when a fraud is "discovered" in this context, the "discovery rule" is applicable. *See Merck*, 559 U.S. at 646. The

rule stands for the proposition that the statute of limitations begins "not only once a plaintiff actually discovers the facts, but also when a hypothetical reasonably diligent [investor] would have discovered them." *Merck*, 559 U.S. at 646-647. Stated differently, courts determine the onset of the statute of limitations period in one of two ways: "(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first." *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 273 (3d Cir. 2013); *Chao Sun v. Daqing Han*, No. 15-703, 2015 U.S. Dist. LEXIS 170005, at *57 (D.N.J. Dec. 21, 2015); *Omanoff v. Patrizio & Zhao, LLC*, No. 14-723, 2015 U.S. Dist. LEXIS 43086, at *17 (D.N.J. Mar. 31, 2015).

> In determining the time at which "discovery" of those "facts" occurred, terms such as "inquiry notice" and "storm warnings" may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered "the facts constituting the violation," including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.

*Merck*, 559 U.S. at 653. Indeed, to be sure, the "discovery" rule ensures that the statute of limitations will only begin to run when a reasonably diligent plaintiff should have discovered facts permitting it to successfully plead a claim, including all elements, under section 10(b). *See Alaska Elec. Pension Fund v. Pharmacia Corp.*, 2012 U.S. Dist. LEXIS 67266, at *18-19 (D.N.J. Ma 11, 2012); *Steamfitters Local 449 Pension Fund v. Alter*, No. 09-4730, 2011 U.S. Dist. LEXIS 112499, at *16-17 (D.N.J. Sept. 30, 2011) (finding that, because plaintiff was unable to state a claim until it had evidence of scienter, the court could not hold as a matter of law that plaintiff's claims were barred by the statute of limitations on a motion to dismiss).

Finally, as a procedural matter, these inquiries are typically fact intensive, and thus, courts are reluctant to dismiss a complaint as untimely prior to discovery. *See, e.g.*, *Dalicandro v.*

*Legalgard, Inc.*, No. 99-3778, 2004 U.S. Dist. LEXIS 2253 (E.D. Pa. Jan. 21, 2004). However, a dismissal may be warranted where a plaintiff has pled "facts that show that his suit is time-barred or otherwise without merit." *Tregenza v. Great American Communications, Co.*, 12 F.3d 717, 718 (7th Cir. 1993) (stating that, in such instances, the plaintiff "has pleaded himself out of court"). Indeed, the Third Circuit has held that "where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading," *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994), courts can dismiss a claim on timeliness grounds in the context of a motion to dismiss. In doing so, a court "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Id.* at 1385 n.2.

Here, the Moving Defendants rest their statute of limitations defense on two different public disclosures: 1) newspaper articles regarding the Remington acquisition in March 2014, and 2) GDS's filing of its 2013 10-K in March and April of 2014. According to the Moving Defendants, because of these public disclosures, Plaintiff was put on notice to discover the bases of his claim at that time, and because Plaintiff filed his Complaint in August 2016, the Moving Defendants argue that Plaintiff's § 10(b) claim is time barred.

In response, Plaintiff argues that the statute of limitations did not begin to run until the facts constituting every element of a § 10(b) claim, including scienter, could have been discovered. And, such time, Plaintiff argues, was when the SEC filed its Complaint against various defendants named in this litigation, *i.e.*, August 11, 2016. In that regard, Plaintiff maintains that even if evidence of materially false statements were discoverable by the public before August 11, 2016, a reasonably diligent plaintiff could not have discovered Defendants' scienter, including

Defendants' motive for artificially inflating GDS's stock price to acquire other businesses, until the SEC revealed its internal investigation.

I find that Plaintiff has the better argument on the statute of limitations issue. I am cognizant that the Moving Defendants' statute of limitations defense, at this stage of the litigation without the benefit of discovery, can only be supported by the allegations in the Amended Complaint. As such, the Moving Defendants' timeliness arguments solely focus on the fact that the disclosures made by the news articles[14] and the 2013 10-K, as alleged, revealed that GDS purportedly asserted certain false statements in its press releases regarding the Remington acquisition and its 2013/2014 revenue projections. However, falsity is only one of the elements of a § 10(b) claim. As the Supreme Court made clear in *Merck*, the statute of limitations, by virtue of the discovery rule, does not begin to run until the facts constituting every element could have been discovered. *See Merck*, 559 U.S. at 653. As alleged, however, the news publications and the 2013 10-K did not reveal any facts that would lead a reasonably diligent investor to discover Defendants' scienter, *i.e.*, to allegedly perpetuate schemes of inflating GDS's stock for acquisition purposes, a necessary component of a § 10(b) claim.[15] In fact, not only did Defendants' press release not reveal that Remington rejected GDS's offer, but rather, it reinforced the alleged false message that the companies were still in negotiations. This message may have had the effect of

---

[14]    Indeed, at this stage, I can only rely on the allegations of what the news publications revealed, since the parties have not provided a copy of those articles for the Court's review.

[15]    As explained further below, in pleading scienter, the PSLRA requires that a plaintiff state "with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind," or scienter. *Investors Group v. Avaya, Inc.,* 564 F.3d 242, 252-53 (3d Cir. 2009) (internal quotation marks, citations, and footnote omitted) (emphasis added). As such, "whether the 'discovery' of [ ] scienter-related fact[s] . . . is sufficient . . . [to] start[ ] the running of the statute of limitations in this case, depends on whether those facts give rise to a strong inference that the defendant acted with scienter. *Alaska Elec. Pension*, 2012 U.S. Dist. LEXIS 67266, at *19.

reassuring investors — despite the news articles — which would further obscure Defendants' alleged true motivation for disseminating allegedly false statements. *See Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 402 n.16 (3d Cir. 2006) (finding that reassurances can dissipate investor's fears of malfeasance "if an investor of ordinary intelligence would reasonably rely on" those reassurances). Indeed, according to the Amended Complaint, it was not until the SEC revealed that Remington had rejected GDS's offers, before GDS issued its press release in March 2014, did the investors know the extent of GDS's conduct — not merely that GDS made certain false statements in connection with the Remington acquisition.

As to the allegations involving the revenue forecast, on their face, the 2013 10-K only revealed that Defendants made erroneous predictions, albeit gross estimates, regarding GDS's revenues and business opportunities. However, an "incorrect prediction [about] a firm's future earnings, by itself, does not automatically tell us whether the speaker deliberately lied or just made an innocent (and therefore nonactionable) error." *Merck*, 559 U.S. at 650. Based on the contents of the 10-K, alone, at the time it was filed, a reasonably diligent investor would not have been on notice to discover the facts necessary to state a claim under § 10(b), particularly since, based on the pleadings, the probative discoverable facts regarding Defendants' scienter or motive were not made obvious by the 10-K.[16]

Nor am I convinced by the Moving Defendants' argument that negative market reaction after these public disclosures put Plaintiff on notice of Defendants' alleged malfeasance. In doing so, the Moving Defendants rely on cases decided pre-*Merck*, before the Supreme Court abrogated the inquiry notice standard in the context of statute of limitations related to securities claims. *See,*

---

[16]     Defendants did not make any timeliness arguments regarding Plaintiff's Airtronic merger allegations; thus, I will not discuss such a contention here.

*e.g., In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 543 F.3d 150, 167 (3d Cir. 2008). While I question the continued viability of these decisions post-*Merck*, in this case, even taking into account the alleged market reaction after each of the public disclosures, I do not change my conclusion. For one, as alleged, GDS's stock prices fell based on the information in these public disclosures, *i.e.*, lower than predicted revenues and that Remington's acquisition was rejected. Thus, these market reactions would not have placed a reasonably diligent investor on notice of Defendants' scienter. Indeed, the relevant inquiry, here, is whether Plaintiff was aware of facts implicating Defendants' state of mind, and based on the allegations of the market reactions, I cannot so find.[17]

However, because the Court's decision on the Moving Defendants' statute of limitations defense is solely based on the pleadings, they may renew their timeliness defense on a summary judgment motion, should discovery produces new evidence on this issue.

### B.      Economic Loss and Causation

Before I discuss Plaintiff's causation allegations, I first address the Moving Defendant's contention that, as a matter of law, a stock purchase at an artificially inflated price is not an economic loss sufficient to state a § 10(b) claim. Indeed, as the Supreme Court has advised "an inflated purchase price will not *itself* constitute or proximately cause the relevant economic loss." *See Dura Pharma., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (emphasis added). In this case, Plaintiff not only alleges that he purchased inflated stock, but he also alleges that GDS's shares "plummeted" each time there was a public disclosure regarding the true financial nature of GDS's

---

[17]      Defendants argue that Plaintiff's § 20(a) claim against the Individual Defendants is time barred, based on identical arguments raised in the context of the § 10(b) claim. Because I have rejected those arguments in the context of their § 10(b) claim, I will deny Defendants' dismissal motion as to Plaintiff's § 20(a) claim for the same reasons.

business, which removed any inflation from GDS's stock price. *See* Am. Compl.,¶¶ 50-53 (following the filing of the Kett Declaration, stating that Airtronic did not have a $95 million contract, shares of GDS fell 17.6%); ¶¶ 54-57 (after the merger with Airtronic fell through, GDS shares fell 11.1% on immense trading volume); ¶ 81 (after Remington's CEO's publicly leaked rejection of GDS's offer to purchase Remington, shares of GDS fell over 15%); ¶¶ 70-71 (after the filing of the 2013 10-K showing that GDS missed its first quarter 2014 revenue projections, its stock fell 16%); ¶¶ 72-72 (following the filing of the 2014 10-K showing that GDS missed its full year 2014 revenue forecast, GDS shares fell over 9%); Ex. 1 (print out stock price in August 2016) to Rosen Decl. (after the filing of SEC's Complaint in August 2016, GDS's shares dropped 52%). I am, therefore, satisfied that Plaintiff has sufficiently pleaded the element of economic loss.

As to loss causation, this element requires the plaintiff to plead that the alleged misrepresentation or omission proximately caused the economic loss. *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007). Similar to the concept of proximate cause in the tort context, loss causation focuses on "whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006) (citations omitted). In that regard, "[t]he loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement." *Id.* (citation and quotation omitted). Put differently, this element requires the plaintiff to allege that "'it was the very facts about which the defendant lied which caused its injuries.'" *Id.* (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997)).

Typically, a plaintiff can meet this burden by alleging that a price of a security was inflated due to a fraudulent misrepresentation. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d

Cir. 2000); *Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir. 1992); *Scattergood v. Perelman*, 945 F.2d 618, 624 (3d Cir. 1991). In such cases, there is a direct causal connection between the false statements and plaintiff's alleged economic loss. *Semerenko*, 223 F.3d at 184. Loss causation can also be satisfied where a fraudulent misrepresentation induces the plaintiff to enter into the challenged transaction. *Berckeley Inv. Group*, 455 F.3d at 223. Of course, a plaintiff does not meet the loss causation element if he fails to allege that the drop in the value of a security is related to the alleged misrepresentation. *See Semerenko*, 223 F.3d at 185.

Importantly, alleging loss causation or economic loss does not require a plaintiff to satisfy the heightened pleading standard under Rule 9(b); rather, "neither the Rules nor the securities statutes impose any special further requirement" in pleading these two elements. *Dura Pharms.*, 544 U.S. at 346 ("[T]he Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' . . . [N]either the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss."); *Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D. 171, 181 (D. Del. 2010); *In re DaimlerChrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 626, 629 (D. Del. 2003); *In re Urban Outfitters Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015).

Here, the Moving Defendants submit the following contentions challenging the sufficiency of Plaintiff's loss causation allegations: 1) Plaintiff's allegations of the market's discovery of the court filing are not plausible; 2) the Forms 10-K do not prove loss causation; 3) the Remington

press release is not actionable; and finally, 4) the SEC Complaint is not a corrective disclosure.[18] I will address each more in detail.[19]

i)      *Market Discovery of Court Filing*

As set forth above, regarding the Airtronic merger, Plaintiff alleges that when Kett, the president of Airtronic, filed a declaration in the bankruptcy proceedings claiming that the purported $90 million government contract did not exist, her public disclosure caused — a day later — shares of GDS to fall 17.6%. *See* Am. Compl., ¶¶47-53. The Moving Defendants argue, without citing to any authority, that "it is not plausible that the private court action filing . . . was actually disclosed to the market" and "[n]either is it plausible that the market even had access to the court filing." Defs.'s Br. in Supp., p. 11.

I start with the fact that the Moving Defendants did not cite to any case law to support their position that a public filing in a court proceeding cannot, as a matter of law, constitute a public disclosure[20] for § 10(b) purposes. The Court has not been able to find any decision that stands for that legal proposition. Rather, while Plaintiff relies on case law in the context of the public's right of access to court documents, the import of those decisions is nevertheless helpful here. Indeed, there is no question that documents filed with a court are generally presumed to have entered the

---

[18]     The Moving Defendants make the additional argument that Plaintiff failed to allege that the filing of the SEC complaint caused a decline in stock price. However, since I already determined that I am taking judicial notice of the declining stock prices days immediately after the revelations of the SEC Complaint become public, I do not find this argument persuasive.

[19]     It bears noting that the Moving Defendants' briefings are written in number paragraphs, and for each argument they advance in their papers, only a few citations to case law are used (most times only one citation) to support their arguments; the briefings are also bereft of legal analysis.

[20]     Stated differently, Plaintiff is alleging that Kett's court filing was a "corrective disclosure," which is, a public disclosure that reveals a previously concealed truth that has been alleged to cause a decline in the defendant company's stock price. *Dura Pharms*, 544 U.S. at 347.

public domain. *See Mine Safety Appliances Co. v. N. River Ins. Co.*, 73 F. Supp. 3d 544, 559 (W.D. Pa. 2014); *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 161 (3d Cir. 1993); *Bryan v. United States*, No. 10-66, 2017 U.S. Dist. LEXIS 11531, at *11 (D.V.I. Jan. 27, 2017). That legal precept is beyond doubt. At this conjuncture, Plaintiff is required to plead a corrective disclosure and a corresponding drop in stock price, which he has done. To the extent that the alleged court filing by Kett was not actually disclosed to the public, such that it had no impact on GDS's stock price, Defendants can submit evidence in that regard on a summary judgment motion or at trial. Suffice it to say, at this pleading stage, Plaintiff has sufficiently pled loss causation in this context.

ii)      *The Forms 10-K*

The Moving Defendants maintain that the 2013 and 2014 Forms 10-K do not establish loss causation because they do not disclose any purported schemes, but merely, lower revenue expectations. Tellingly, however, Plaintiff has not specifically responded to Defendants' argument that the 10-K Forms do not adequately allege loss causation. In my view, there are two issues with respect to the 2014 and 2013 10-K Forms. First, glaringly absent from the Amended Complaint — in connection with Plaintiff's allegations regarding GDS's 2013 revenue forecast in its November 2013 press release — is any assertion of an inflated stock price after the allegedly false statements made in that press release. Indeed, Plaintiff alleges that GDS issued a press release in November 2013, which falsely stated that "during the fourth quarter of 2013, GDSI expects to be able to announce several agreements regarding potential acquisitions . . . [and] [t]aking into account GDSI's various lines of business and assuming these additional strategic acquisitions move forward as expected, the company anticipates that if it closes the potential acquisitions, it may achieve an annual revenue run rate between $60 million and $75 million during the first

quarter of 2014." Am. Compl., ¶ 60. In that regard, Plaintiff accuses Defendants of making false statements in the press release because in November 2013, GDS did not have any lines of business, it had $0 in revenue, and it had no cash reserves to finance any acquisitions. *See Id.* at ¶¶ 63-65. However, nowhere does Plaintiff allege any market reaction to the false statements. As I noted earlier, to properly plead loss causation, Plaintiff must allege that a price of a security was inflated due to a fraudulent misrepresentation; that, in fact, is the quintessential requirement of causation on a § 10(b) claim. *See Semerenko*, 223 F.3d at 184. Plaintiff has not alleged that GDS's stock prices were artificially inflated due to the false and misleading statements made in the November 2013 press release. Rather, the only market reaction Plaintiff has alleged in this regard, is how GDS's stock fell *after* disappointing revenue figures were disclosed in the 2013 and 2014 10-K Forms. See Am. Comp., ¶¶ That is not sufficient to establish loss causation.

Next, as Defendants have highlighted, another deficiency is that the 2013 and 2014 Forms 10-K do not make any corrective disclosures such that they revealed the false nature of the November 2013 press release. Indeed, a plaintiff cannot demonstrate loss causation simply by alleging "a negative financial result after each financial public disclosures, when there have been no allegations that the market recognized any of the alleged fraud, or that the cause of the decline in stock price was substantially caused by the alleged fraud." *Nat'l Junior Baseball League v. PharmaNet Dev. Group, Inc.*, 720 F. Supp. 2d 517, 561-62 (D.N.J. 2010) (citing *In re Tellium, Inc. Securities Litigation*, No. 02-5878, 2005 U.S. Dist. LEXIS 26332, at *12-14 (D.N.J. Aug. 26, 2005)); *see D.E. & J. Limited P'Ship v. Conaway*, 133 F. App'x 994, 1000-01 (6th Cir. 2005) (holding that plaintiffs' allegations of a stock price drop following a disclosure that it had filed for bankruptcy reorganization did not adequately show loss causation because they did not allege that the announcement disclosed any prior misrepresentation to the market resulting in a subsequent

price drop in the stock); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (holding that stock price drop following downgrade of stock did not amount to a corrective disclosure because the downgrades did not reveal to the market the falsity of the prior recommendations); *In re IPO, Liu v. Credit Suisse First Boston Corp.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) (holding that a failure to meet earnings forecasts does not have a corrective effect because it does not "disclose the scheme" and therefore "cannot correct the artificial inflation caused by the scheme").

The same holds true here. Distilled to its essence, Plaintiff only alleges that the 2013 and 2014 Forms 10-K revealed less than anticipated GDS revenue, and that no acquisitions took place in 2014. *See* Am. Compl., ¶¶ 63-66, 70, 72. Indeed, at worst, the Forms made clear that GDS "missed its revenue projection [*inter alia*], earning $0 in the first quarter of 2014, and not $15 million to $18.75 million during the first quarter of 2014." *Id.* at ¶ 70. However, Plaintiff has not alleged that the Forms revealed the falsity of GDS's November 2013 press release; at best, the Forms, on their face, merely show lower revenues, which is not a disclosure of GDS's alleged scheme. *See In re DVI, Inc. Sec. Litig.*, No. 03-05336, 2010 U.S. Dist. LEXIS 92888, at *28 (E.D. Pa. Sep. 3, 2010) ("A disclosure of disappointing earnings or other indications of the 'true financial condition' of the company, without any evidence of a link between the disclosure and the fraud, is not a corrective disclosure."); *In re IKON Office Solutions, Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 689-90 (E.D. Pa. 2001); *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 337-38 (5th Cir. 2010); *In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690, 702-03 (D. Minn. 2009). As such, loss causation has not been adequately established, since the announcements made in the 2013 and 2014 Forms 10-K did not disclose any prior misrepresentation to the market resulting in a subsequent price drop in stock price.

Relying on a single case, Defendants contend that the Remington Press Release is not actionable because the document, containing forward-looking opinions and accompanied by cautionary statements, expressly invokes the safe harbor provision of the PSLRA.  According to the press release, Defendants provided information regarding three proposed transactions, including an unsolicited letter of intent to acquire Remington for $1.082 billion in cash.  *See* Press Release dated March 11, 2014, p. 1.[21]  The press release touted that Remington has estimated its net sales for 2013 to be in the range of $1.250 billion to $1.275 billion.  In that regard, the press release stated that Defendants are optimistic regarding the GDS's growth in light of the planned acquisitions.  *Id.* at pp. 1-2 ("Results like these truly [represent] the baseline of our expectation going forward . . . . The bottom line is:  Our excitement and confidence derive from the fact that we've done this before and we see enormous potential that we'll be able to do it again.").  At the bottom of the press release is a provision regarding forward-looking statements:

> This press release contains "forward looking statements" within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.  The statements in this press release that are not purely historical are forward looking statements.  Forward-looking statements give the Company's current expectations or forecasts of future events.  Such statements are subject to risks and uncertainties that are often difficult to predict and beyond the Company's control, and could cause the Company's results to differ materially from those described . . . . The statements are based upon current beliefs, expectations and assumptions and are subject to a number of risks and uncertainties, many of which are difficult to predict . . . . We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends affecting the financial condition of our business.  Forward looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times at, or by, which such performance or results will be achieved.

---

[21]     Because the Amended Complaint explicitly references and relies on the March 2014 press release, the content of that document can be considered by the Court on a motion for dismiss.  *See In re Burlington Coat Factory*, 114 F.3d at 1426.

*Id.* at p. 3.

Under the PSLRA, "forward-looking" statements are not actionable if they are "(1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." *In re Aetna Sec. Litig.*, 617 F.3d 272, 278-79 (3d Cir. 2010). The PSLRA's definition of "forward-looking statement" includes, *inter alia*, "projections of future performance, plans and objectives for future operations, and assumptions underlying statements about future financial, economic or operational performance." *Id.* at 279 (citing 15 U.S.C. § 78u-5(i)(1)). This safe harbor for forward-looking statements overlaps with the Third Circuit's "bespeaks caution" doctrine, adopted in *In re Trump*, 7 F.3d 357 (3d Cir. 1993). Under this doctrine, "cautionary language, if sufficient, renders the alleged [forward-looking] omissions or misrepresentations immaterial as a matter of law." *Id.* at 371. Under both the PSLRA and the bespeaks caution doctrine, cautionary language must be extensive, specific, and directly related to the alleged misrepresentation to provide a safe harbor. *See In re Aetna*, 617 F.3d at 282.

Here, the safe harbor provision of the PSLRA cannot save the alleged false statements regarding the Remington acquisition for the simple reason that, as alleged by Plaintiff, Defendants made seemingly forward-looking statements regarding the prospect of acquiring Remington when they knew the purchase would not ever be consummated. Plaintiff alleges that GDS made an offer of intent to acquire Remington for the purchase amount of $1.082 billion. I note that this statement is not forward-looking, as the press release is not making any projections; rather, GDS was making a statement regarding an acquisition already *in progress*. But, to the extent that this statement can be construed as forward-looking, Plaintiff has alleged that when Defendants made the public announcement regarding the Remington purchase, Defendants knew that Remington had no

interest at all in GDS's offer. Am. Compl., ¶ 86. According to Plaintiff, GDS was aware — before issuing the March 2014 press release — that Remington had rejected offers made by GDS. *Id.* at ¶ 82. Indeed, as alleged, GDS further knew that its investment bank had discontinued finding financing options for a Remington deal. *Id.* at ¶ 85. Thus, the statements made by Defendants regarding the Remington acquisition were allegedly made with knowledge that the offer to purchase would never come to fruition; contrary to the Moving Defendants' argument, those statements do not fall within the purview of the safe harbor provision. *See In re Aetna*, 617 F.3d at 278-79.

iv)     *SEC Complaint*

Finally, the Moving Defendants contend that Plaintiff cannot rely on the unproven allegations in the SEC Complaint as a corrective disclosure in order to plead the market's discovery of Defendants' alleged fraud. I do not agree. I start with the Supreme Court's general principle, announced in *Dura Pharms.*, that a corrective disclosure need not take a particular form; it is the exposure of the falsity of the fraudulent representation that is the critical component. *See In re DVI,* 2010 U.S. Dist. LEXIS 92888, at *25; *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006); *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008); *In re Winstar Comm'ns*, No. 01-3014, 2006 U.S. Dist. LEXIS 7618, at *14 (S.D.N.Y. Feb. 27, 2006) *aff'd*, 597 F.3d 501 (2d Cir. 2010). In that regard, a "corrective disclosure" must reveal at least part of the falsity of the alleged misrepresentation, and it must reveal new information to the market. *In re DVI*, 2010 U.S. Dist. LEXIS 92888, at *25-26; *see, e.g., In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690, 698 (D. Minn. 2009); *In re Omnicom Group, Inc.*, 541 F. Supp. 2d at 551; *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)

("[The disclosure] must at least relate back to the misrepresentation and not to some other negative information about the company.").

The truth may be revealed to the investing public through means other than defendant's corrective disclosure. *See Dura Pharms.*, 544 U.S. at 343 (speaking in terms of "truth leaking out"). For instance, in addition to formal disclosure by a defendant, "the market may learn of possible fraud [from] a number of sources: *e.g.*, from whistleblowers, analysts questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, *etc.*" *Newby v. Enron Corp.*, No. 01-3624, 2005 U.S. Dist. LEXIS 41240, at *59 (S.D. Tex. Dec. 22, 2005) (citation omitted); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 297 n.18 (D.N.J. 2007); *In re Elec. Data Sys. Corp. Secs. & "ERISA" Litig.*, 298 F. Supp. 2d 544, 560-61 (E.D. Tx. 2004) (noting that defendant should not be rewarded by denying defrauded investors recovery simply because the information revealing the alleged fraud was a third party's opinion, since defendants "cannot escape liability for fraud simply by not admitting the fraud"); *In re Winstar Comm'ns.*, 2006 U.S. Dist. LEXIS 7618, at *45 ("[T]he [*Dura Pharms.*] Court did not address the means by which the information is imparted to the public. Specifically, *Dura* did not set forth any requirements as to who may serve as the source of the information, nor is there any requirement that the disclosure take a particular form or be of a particular quality.").

In connection with those general principles regarding "corrective disclosures," various courts have held that allegations that a company was the subject of SEC investigations are sufficient to meet the pleading requirement for loss causation. *See Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 256 (D. Mass. 2006) (finding loss causation adequately pled where the plaintiffs had alleged that the company's disclosure of an SEC investigation relating to Defendants'

misleading statements had "shocked the market" and caused the stock price to drop); *In re Bradley Pharm.*, 421 F. Supp 2d at 829 (reasoning that the securities laws do not operate in a "vacuum," and that "Defendants' contention that the announcement of the SEC inquiry did not satisfy *Dura's* 'revelation of the truth' requirement fails to acknowledge the significance of the market reaction to the February 28, 2005 disclosure"); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287 (S.D.N.Y. 2008) (finding that an announcement of "informal" SEC investigation sufficient to plead loss causation); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 203 (same); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 387 (E.D.N.Y. 2013) (collecting cases).

As the above-cited authorities made clear, the Supreme Court does not require that the corrective disclosure take any particular format; so long as the plaintiff alleges that the public disclosure reveals that the defendant company made false claims, and that based on those disclosures, a corresponding drop in stock price occurred, loss causation is adequately pled. Because, here, Plaintiff alleges that the SEC Complaint contains information that directly reveals the truth regarding the alleged false statements made by Defendants in their various press releases, and because the SEC's disclosure caused a drop in stock price, I find that SEC Complaint can be the basis for a corrective disclosure.

Nevertheless, the Moving Defendants cite to one out-of-circuit district court case for the proposition that a filed SEC complaint cannot, as a matter of law, serve as a corrective disclosure: *Puddu v. 6D Global Techs., Inc.*, 239 F. Supp. 3d 694 (S.D.N.Y. 2017). While the *Puddu* Court found that a SEC Complaint cannot be the basis of a corrective disclosure, since it contains unproven allegations made by the government, I do not find *Puddu*'s reasoning persuasive. *See id.* at 708. For one, the court there had no analysis of why in its view, a SEC complaint does not satisfy the flexible approach taken by the Supreme Court in *Dura Pharms.*, as I have just explained

it. But, more importantly, *Puddu* cites erroneously to *Discover Growth Fund v. 6D Glob. Techs. Inc.*, No. 15-7618, 2015 U.S. Dist. LEXIS 147559 (S.D.N.Y. Oct. 30, 2015), for support of that very proposition. In a context of a preliminary injunction, the court in *Discover Growth* held that the plaintiff may not rely on a SEC complaint to prove plaintiff's allegation that defendant is an alter ego of another company, because the allegations in the SEC pleadings are not evidence of the truth of the assertions therein. *Id.* at *23. In my view, the context in which *Discover Growth* made such a finding is entirely different than the loss causation context in a § 10(b) claim. The former is related to evidence in proving a particular fact, and the latter, such as in this case, a SEC Complaint — irrespective of its legal nature — serves to disclose certain information previously unknown to the public that reveals the falsity of misrepresentations allegedly made by Defendants. Accordingly, I reject *Puddu*'s reasoning, and find that Plaintiff has adequately alleged loss causation based on the SEC Complaint as a corrective disclosure.[22]

### C.     Reliance

As to the element of reliance, or transactional causation, a securities plaintiff is required to plead that the he was actually aware of and misled by an alleged misrepresentation. *See McCabe*, 494 F.3d at 424. In this case, to satisfy reliance, Plaintiff asserts that he relies upon the presumption established by the fraud-on-the-market theory and the presumption established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), with regards to omissions.

---

[22]     The Moving Defendants argue that because the value of one share of GDS's stock had already declined to one cent before the SEC Complaint was filed, there was no stock price on which there could be an impact. While that argument may bear true after the parties submit their respective evidence, including expert opinions, regarding the impact the SEC Complaint had on the market, at this stage of the litigation, however, it is sufficient that Plaintiff has pled that the stock price fell 52% a day after the SEC made its filing. *See In re Merck & Co., Sec., Derivative & ERISA Litig.*, No. 05-1658, 2011 U.S. Dist. LEXIS 87578, at *127 (D.N.J. Aug. 8, 2011).

2i)       *Fraud-on-the-Market*

The Moving Defendants argue that Plaintiff has failed to allege that GDS's stock was traded in an efficient market to invoke the presumption of reliance under the fraud-on-the-market theory.  "Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988); *see Sklar v. Amarin Corp. PLC*, No. 13-663, 2014 U.S. Dist. LEXIS 103051, at *23 n.4 (D.N.J. Jul. 29, 2014).  "The fraud-on-the-market presumption of reliance is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) (quoting *Basic*, 485 U.S. at 241-42). "Thus, the presumption of reliance is available only when a plaintiff alleges that a defendant made material representations or omissions concerning a security that is actively traded in an 'efficient market,' thereby establishing a 'fraud on the market.'" *Id.*   This presumption, however, is rebuttable. *Basic*, 485 U.S. at 248 ("Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance.").

Importantly, to invoke the fraud on the market theory, a plaintiff must first establish that the securities at issue traded in an open and efficient market. *In re Burlington*, 114 F.3d at 1419 (citing *Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir. 1992); *Peil v. Speiser*, 806 F.2d 1154, 1161 (3d Cir. 1986)); *In re DVI*, 249 F.R.D. at 208.  "[I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company

and its business." *Basic*, 485 U.S. at 241 (citation omitted). The Third Circuit has defined an "efficient" market as one where "information important to reasonable investors . . . is immediately incorporated into stock prices." *In re Burlington*, 114 F.3d at 1425 (citation omitted). Importantly, at a motion to dismiss stage, a plaintiff need not prove that the subject securities were in fact traded on an efficient market;[23] rather, the inquiry is whether plaintiff has pleaded one. *See Hayes v. Gross*, 982 F.2d 104 (3d Cir. 1992).

Here, Plaintiff alleges that the presumption applies because 1) Defendants made public misrepresentations or failed to disclose material facts during the class period; 2) GDS's securities are traded in an efficient market; 3) the Company's shares were liquid and traded with moderate to heavy volume; 4) the Company traded on an OTC exchange; 5) the alleged false statements made by Defendants would tend to induce a reasonable investor to misjudge the value of the Company's securities; and 6) Plaintiff purchased GDS's stock without knowledge of the omitted and misrepresented facts. Am. Compl., ¶ 122. Plaintiff relies heavily on the fact that GDS's stock was traded in an OTC exchange.

Despite some courts finding that an OTC market may not be efficient,[24] "[m]ost courts have held that where a stock is traded—in an over the counter market . . . versus on a national exchange—is not dispositive as to whether the market for that stock is efficient." *Petrie*, 308

---

[23]     An efficient market is one that "react[s] quickly in processing information[,] enabling it [] to be reflected in the market price." *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 349 (C.D. Cal. 2015) (quoting 4 Thomas Lee Hazen, Law Sec. Reg. § 12.10 (2015)); *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999) ("The question is whether such a market is efficient—meaning simply whether the stock prices reflect public information.").

[24]     *See, e.g.*, *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 473 n.9 (S.D.N.Y. 2014); *Epstein v. Am. Reserve Corp.*, No. 79-4767, 1988 U.S. Dist. LEXIS 3382, at *5 (N.D. Ill. Apr. 21, 1988); *In re Data Access Sys. Securities Litigation*, 103 F.R.D. 130, 138 (D.N.J. 1984) ("The trading on the over-the-counter market may not constitute an 'active and substantial' market necessary to apply the fraud-on-the-market theory.").

F.R.D. at 349; *see Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001); *Cammer v. Bloom*, 711 F. Supp. 1264, 1280-84 (D.N.J. 1989). Instead, as this Court has explained *supra*, a plaintiff must allege that the subject stock traded in an efficient market. To do so, the plaintiff can allege that the stock: (1) was traded on a public exchange; (2) had large trading volumes; (3) were followed by market analysts; (4) had several market makers; (5) could be and were registered on SEC Form S-3; and (6) responded quickly to the release of company-specific information. *Cammer*, 711 F. Supp. at 1286-87. These are often referred to as the *Cammer* factors, and they are "an analytical tool rather than as a checklist" of requirements. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-1898, 2006 U.S. Dist. LEXIS 52991, at *25 (S.D.N.Y. Aug. 1, 2006); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 632 (N.D. Ala. 2009). These factors may be supplemented by other measures, such as the company's market capitalization, the bid-ask spread, or the percentage of institutional ownership.

Here, simply alleging that GDS's stock was traded on the OTC market with moderate to heavy volume during the relevant period is not sufficient to establish an "efficient market." As I review the decisions, including those cited by Plaintiff, sufficient allegations of an efficient market, for example, look to

1) the percentage of the weekly trading volume;
2) coverage of a company's stock by "significant number of securities analysts";
3) reported number of market-makers[25];
4) GDS's eligibility to file an SEC Registration Form S-3 and the number of months the form was filed;
5) the measurement of "the difference between the price at which current stockholders are willing to buy the stock and the price at which current stockholders are willing to sell their shares," *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003);

---

[25]     A market-maker is "one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices." *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613-14 (C.D. Cal. 2009).

6) number of institutional investors, *see Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 511 (D. Kan. 2014); *In re HealthSouth*, 261 F.R.D. at 637;

7) percentage of shares held by insiders, or the float, *see* Krogman, 202 F.R.D. at 478; and

8) the percentage of shares outstanding that has been sold short, *see Petrie*, 308 F.R.D. at 357.

While this is not an exhaustive list of the factors, Plaintiff has not alleged any of the listed-circumstances to establish an efficient market under the PSLRA's pleading regime. Instead, Plaintiff's conclusory allegations that GDS's stock was traded heavily in an efficient market are deficient. Accordingly, I find that Plaintiff has not alleged reliance based on a fraud-on-the market theory.

### iii) *Affiliated Ute Citizens of the State of Utah v. United States*

In *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972), the Supreme Court held that in cases seeking to predicate Rule 10b-5 liability upon omissions, reliance will be presumed from the materiality of the information not disclosed. *See Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 192 (3d Cir. 2001). The Moving Defendants argue that Plaintiff is not entitled to the presumption under *Affiliated Ute Citizens*, because he has not alleged any material omissions in his Amended Complaint; rather, as alleged, the press releases sent by Defendants knowingly and willfully made material misrepresentations regarding the financial status of GDS. Tellingly, Plaintiff did not respond in substance to the Moving Defendants. On this basis alone, I find that Plaintiff is not entitled to a presumption in this context. *See Duran v. Equifirst Corp.*, No. 09-03856, 2010 U.S. Dist. LEXIS 22904, at *3 (D.N.J. Mar. 12, 2010) ("The absence of argument constitutes waiver in regard to the issue left unaddressed . . ."); *Griglak v. CTX Mortgage Co.*, LLC, No. 09-5247, 2010 U.S. Dist. LEXIS 34941, at *7 (D.N.J. Apr. 8, 2010) ("The failure to respond to a substantive argument to dismiss a count, when a party otherwise files opposition, results in a waiver of that count."); *Leisure Pass N. Am., LLC v. Leisure Pass Group, Ltd.*, No. 12-

3375, 2013 U.S. Dist. LEXIS 120593, at *11 (D.N.J. Aug. 26, 2013); *Ferrante v. Amgen, Inc.*, No. 13-7344, 2014 U.S. Dist. LEXIS 34975, at *20 (D.N.J. Mar. 18, 2014) (noting that "Courts in this District have held that the failure to respond to an argument advanced in support of a motion to dismiss results in a waiver of the claim sought to be dismissed").  However, more importantly, the Amended Complaint, while couching Defendants' statements as material misrepresentations or omissions, fails to actually plead any omissions on the part of the Defendants.  Nowhere in the Amended Complaint does Plaintiff identify information that was not disclosed; rather, the bulk of the fraudulent conduct is based on the assertion that Defendants released multiple public documents that contain false financial representations, in an effort to inflate company stock.  Thus, Plaintiff cannot transform the alleged misrepresentations into omissions simply by alleging that Defendants failed to disclose that the allegedly misleading fact was untrue.  Indeed, those allegations do not amount to omissions.  *See Johnston*, 265 F. 3d at 193.  Accordingly, Plaintiff is also not entitled to rely on the presumption under *Affiliated Ute Citizens*.

Plaintiff has not adequately alleged the element of reliance.

### D.   Scienter

"Scienter" stands for the "mental state [of] intent to deceive, manipulate or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). Under this PSLRA's pleading requirement, a plaintiff must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Avaya*, 564 F.3d at 267 (quoting 15 U.S.C. § 78u-4(b)(2)).  The scienter standard requires a plaintiff to allege facts giving rise to a "strong inference of "either reckless or conscious behavior." *Advanta*, 180 F.3d at 534-35. Courts must weigh the "plausible nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs*, 127 S. Ct. at 2510.

A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 2504-05; *see id.* at 2510 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences" (internal quotation marks omitted)). The pertinent question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509. Omissions and ambiguities "count against inferring scienter." *Id.* at 2511.

Here, Plaintiff alleges the following as his basis for scienter:

> Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Global Digital, his/her control over, and/or receipt and/or modification of Global Digital's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Concordia, participated in the fraudulent scheme alleged herein.

> Defendants used the artificially inflated stock price to raise funds, thereby lessening the costs of acquisitions. According to the 2013 10-K, in 2013 Global Digital sold 5,634,000 shares of common stock in private placements to accredited investors for gross proceeds of $2,011,100. In addition to private placement agreements, Global Digital closed on a loan and exercised warrants, and with the private placement, the Company receiving gross proceeds of $3,186,100.

Essentially, Plaintiff's scienter allegations boil down to the fact that Defendants allegedly made knowingly false statements in a series of press releases in order to inflate GDS's stock prices; Plaintiff alleges that, in doing so, Defendants sought to raise revenue in acquiring different businesses.

       i.       *Motive*

Relying on *GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004), the Moving Defendants first argue that motivation by the desire to effect acquisitions and reap the benefits from those acquisitions is not sufficient to plead scienter. The Moving Defendants' reliance on *GSC Partners* is misplaced.

While motive is not a prerequisite to establish scienter, such allegations strengthen the pleadings of scienter. In that regard, a motive must be supported by facts stated "with particularity." *In re Advanta*, 180 F.3d at 535; 15 U.S.C. § 78u-4(b)(2). "Blanket assertions of motive and opportunity" will not suffice, and "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." *In re Advanta*, 180 F.3d at 535. Moreover, "'[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud.'" *GSC Partners*, 368 F.3d at 237 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citation omitted)). In that regard, in every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction. Such allegations, alone, cannot give rise to a "strong inference" of fraudulent intent. *See In re Burlington*, 114 F.3d at 1424; *GSC Partners*, 368 F.3d at 237-38.

In *GSC Partners*, defendant Washington Group International, Inc. ("Washington"), sought to acquire another company. *GSC Partners*, 368 F.3d at 232. The plaintiffs alleged that in order to raise funds for the acquisition, Washington issued false and misleading circulars in an attempt to sell notes. *Id.* at 235. The plaintiffs, who purchased the notes, argued that Washington had the

motive to commit fraud because the acquisition would not have been successful but for the sales of the notes, in part, to the plaintiffs. *Id.* at 237. The Third Circuit rejected that argument, finding that the plaintiffs did not meet the heightened pleading requirement because a general allegation of a company's desire to affect a merger or acquisition is not sufficient to show a strong inference of scienter. Indeed, as a general matter, allegations that defendants were motivated to commit securities fraud to inflate stock prices because of their compensation and stock holdings are inadequate, because all directors and officers want to see their companies succeed. *See Phillips v. LCI Int'l. Inc.*, 190 F.3d 609, 622-23 (4th Cir.1999); *In re Burlington Coat Factory*, 114 F.3d at 1422 n.12; *In re At&T Corp. Sec. Litig.*, No. 00-5364, 2002 U.S. Dist. LEXIS 22219, at *74 (D.N.J. Jan. 28, 2002). Moreover, claims that officials sought to inflate the price of common stock to "protect and perpetuate and enhance their executive position" do not provide a strong inference of scienter because they allege a motive generic to all corporate officials and fail to explain why the officials would enhance their reputations and careers by a temporary artificial inflation in stock price. *In re Burlington*, 114 F.3d at 1423 n. 12.

However, importantly, when corporate defendants materially misrepresent the financial status of a company to enable stock-based business acquisitions at the time of the alleged misrepresentations, that alleged motive can give rise to a strong inference of scienter. *In re ATI Techs., Inc., Sec. Litig.*, 216 F. Supp. 2d 418, 440 (E.D. Pa. 2002); *see In re Interpool, Inc. Sec. Litig.*, No. 04-321, 2005 U.S. Dist. LEXIS 18112, at *30 (D.N.J. Aug. 16, 2005) ("Courts have found sufficiently alleged motive to mislead investors by artificially inflating the company stock price where the acquisitions were at least partially funded by the company stock"); *Marra v. Tel-Save Holdings, Inc.*, No. 98-3145, 1999 U.S. Dist. LEXIS 7303, *24-25 (E.D. Pa. May 18, 1999) ("Because Plaintiffs have identified an acquisition that took place during the class period

and was funded with a combination of Tel-Save's stock and cash, a strong inference of fraudulent intent is possible"); *see also In re Unisys Corp. Sec. Litig.*, No. 99-5333, 2000 U.S. Dist. LEXIS 13500, at *17-21, (E.D. Pa. Sep. 21, 2000) (holding stock-for-stock merger, avoidance of cash dividend, and insider trades, satisfy scienter); *Marra v. Tel-Save Holdings, Inc.*, No. 98-3724, 1999 U.S. Dist. LEXIS 7303, at *22-26 (E.D. Pa. May 18, 1999) (holding stock-for-stock merger and acquisition using stock as partial consideration satisfy scienter); *Voit v. Wonderware*, 977 F. Supp. 363, 374-75 (E.D. Pa. 1997) (finding scienter from stock-based acquisition and insider trades); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269-71 (2d Cir. 1993) (finding scienter from material omissions designed to artificially inflate stock prices to dilute the effects of upcoming "rights offering"); *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 2004 U.S. Dist. LEXIS 13255, at *43 (E.D. Pa. July 12, 2004). In fact, at least one court has found motive and opportunity to be sufficiently alleged even where the acquisition was not funded by company stock, but where plaintiffs specifically identified how the company achieved a concrete benefit by maintaining stock prices until the acquisition was complete. *See In re AT&T Corp. Sec. Litig.*, No. 00-5364, 2002 U.S. Dist. LEXIS 22219, at *73-74 (D.N.J. Jan. 30, 2002) (finding sufficient motive and opportunity because the plaintiff established a concrete benefit to AT&T in avoiding the extra cash payment to complete the acquisition and showed how this was achieved by maintaining stock prices).

With respect to motive, Plaintiff alleges that Defendants artificially increased GDS's share price to effectuating certain company acquisitions with inflated stocks. Indeed, Plaintiff alleges that, in June 2014, GDS issued a press release announcing that it had entered into an agreement to acquire NACSV, paying for the acquisition, in part, with allegedly inflated stock worth approximately $1.08 million. Am. Compl., ¶ 89. GDS's stock rose over 21% based on this news.

Similarly, Plaintiff alleges that in October 2015, GDS filed a Form 8-K announcing that GDS had entered into an agreement to purchase Rontan for a price that included $26 million in GDS's allegedly inflated stock, and based on this news, Plaintiff further alleges that GDS's shares rose almost 186%. *Id.* at ¶ 94. As such, in this context, I find that by alleging that Defendants made false statements to inflate GDS's stock price in order to fund certain acquisitions, Plaintiff has sufficiently alleged motive with particularity. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (finding that the artificial inflation of stock prices in the acquisition context may be sufficient to establish motive). I am cognizant that Plaintiff's allegation of motive, standing alone, is insufficient to meet the requirement of scienter. *See Avaya*, 564 F.3d at 276. Rather, the Court will analyze the alleged motive, together with the entire Amended Complaint to determine whether scienter has been properly pled with particularity.

ii)     *Conscious Misbehavior and Recklessness*

"Conscious misbehavior is alleged by 'stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior.'" *Aviva Partners LLC v. Exide Techs.*, No. 05-3098, 2007 U.S. Dist. LEXIS 17347, at *33 (D.N.J. Mar. 13, 2007) (quotations omitted). Recklessness is conduct that represents "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Suprema*, 438 F.3d at 276. Again, the key inquiry is whether "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (quotations omitted).

In a general fashion, the Moving Defendants argue that Plaintiff has not sufficiently alleged recklessness because the allegations regarding scienter in that regard are conclusory. Without any in depth analysis or reasoning, the Moving Defendants simply cite to a number of passages in the Amended Complaint to demonstrate their position. This argument is not persuasive. I will address each category of false representations to determine whether scienter has been pled properly.

A plaintiff may support a strong inference of scienter with reckless statements made by defendants, *see Avaya*, 564 F.3d at 267 n.42 ("[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly" by making misleading statements (quoting *Tellabs*, 127 S.Ct. at 2507 n. 3)). Reckless statements are "highly unreasonable" and involve "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979) (quoting *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)); *Gold v. Ford Motor Co.*, 577 F. App'x 120, 123 (3d Cir. 2014). Under a recklessness theory, knowledge can be shown by demonstrating that the fact was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors. *Wilson v. Bernstock*, 195 F. Supp.2d 619, 639 (D.N.J. 2002); *Anderson v. Stonemor Partners, L.P.*, No. 16-6111, 2017 U.S. Dist. LEXIS 179959, at *22 (E.D. Pa. Oct. 31, 2017).

There is no doubt that under the PSLRA pleading regime, a strong scienter can be inferred when defendants make knowing misrepresentations in order to defraud investors. *See Fain v. USA Techs., Inc.,* No. 16-2436, 2017 U.S. App. LEXIS 16615, at *10 (3d Cir. Aug. 30, 2017). As I

have noted before, Plaintiff alleges that Defendants issued three false press releases regarding an allegedly non-existent $95 million government contract that was awarded to Airtronic. *See* Am. Compl., ¶¶ 3, 39, 44, 47. The press releases listed defendants Delgado and Sullivan as contact persons regarding the substance of the press release. Indeed, Plaintiff alleges that in one of the press releases, Defendants fabricated a quote from Airtronic CEO Kett praising the alleged contract. *Id.* at ¶¶ 3, 39, 46. However, this particular press release was issued *after* Kett had questioned Defendants regarding the existence of the government contract, and Kett also allegedly informed Defendants that no such contract ever existed. *Id.* at ¶ 47. In addition, Plaintiff has alleged that Defendants, particularly defendant Loppert, were in control of Airtronic's finances at the time the Company was proceeding with the merger, and therefore, GDS was aware of any contracts that were awarded to Airtronic by the government, or the lack thereof.[26] *Id.* at ¶¶ 30, 51. Thus, these allegations call into question the veracity of Defendants' repeated public statements touting the $95 million contract. *See Medis Investor Group v. Medis Tech., Ltd.*, 586 F. Supp. 2d 136, 142 (S.D.N.Y. 2008) (finding that recklessness can be shown by alleging that defendants "knew facts or had access to information suggesting that their public statements were not accurate"). In that regard, I find that Plaintiff has sufficiently alleged a strong inference that the danger of misleading investors was actually "known" by both defendants Loppert and Delgado, *see Fain,* 2017 U.S. App. LEXIS 16615, at *10; accordingly, Plaintiff has sufficiently pled scienter as to the Airtronic press releases.[27]

---

[26] In addition, in the SEC-related proceedings, both defendants Loppert and Sullivan have allegedly admitted that they knew the Airtronic allegations to be false. Am. Compl., ¶¶ 104, 107-108. *See In re Boston Sci. Corp. Sec. Litig.*, 680 F.3d 21, 31 (1st Cir. 2010)(pleading standard is satisfied when a complaint "contains clear allegations of admissions.").

[27] Here, there is no dispute that the scienter of the individual defendants who are corporate officers with apparent authority, *i.e.*, Loppert and Delgado, is imputed to defendant GDS. *See*

With regard to Defendants' scienter related to the Remington acquisition, Plaintiff alleges that in the 2013 Form 10-K, signed by defendants Delgado, Loppert and Sullivan, GDS admitted that it had no available financing to fund any acquisition, let alone the Remington acquisition. Am. Compl., ¶ 66. Plaintiff further alleges that before issuing the two press releases in March 2014, these individual defendants knew — because Remington had repeatedly told them — that Remington had rejected all GDS's offers. *Id.* at ¶¶ 85-86, 101. Despite those rejections, however, Defendants issued the press releases expressing optimism that GDS would successfully acquire Remington. *Id.* at ¶¶ 74-76. These press releases, as alleged, were "reviewed and edited" by Loppert and Sullivan. *Id.* at ¶ 78. More importantly, Plaintiff alleges that in the 2013 10-K, Defendants again repeated its offer to purchase Remington and stated on the publicly filed form that GDS had "not received a response to this proposal," when in fact, GDS's offers were rejected. *Id.* at ¶¶ 82, 86. Furthermore, similar to the Airtronic allegations, Loppert and Sullivan have admitted in their SEC civil enforcement proceedings, that the averments surrounding the Remington acquisition were true. *Id.* at ¶ 107.[28]

Notwithstanding these allegations, the Moving Defendants argue that Plaintiff has failed to establish scienter by alleging that the corporate officers merely signed the Form 10-K. Put differently, the Moving Defendants contend that Plaintiff cannot sufficiently allege a defendant's state of mind, or knowledge of falsity, by simply claiming that a defendant officer signed a particular public filing. While that may be accurate, Plaintiff has alleged more than a mere

---

*Avaya*, 564 F.3d at 251–52 ("[a]lthough Shareholders' Complaint focuses on the statements of McGuire and Peterson, liability for these statements, if they were fraudulent, can also be imputed to Avaya because a corporation is liable for statements by employees who have apparent authority to make them.")(internal quotations and citations omitted); *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 568 (1982).

[28]     Again, these individual corporate officers' scienter can be imputed to GDS.

signature. As to Loppert, he admitted, in the SEC proceedings, that the allegations involving the Remington acquisition were true, and Loppert, not only signed the press releases, but prepared the content of those releases. *See, e.g., GSC Partners*, 368 F.3d at 239; *Winer Family Trust v. Queen*, 503 F.3d 319, 333-34 (3d Cir. 2007). With regard to Delgado, who allegedly was in charge of "business development," Plaintiff has alleged that he was aware or should have been aware of the false statements that Defendants made in their 2014 press releases and 2013 Form 10-K, because Delgado knew that GDS's own investment bank never attempted to find financing options for a Remington deal, and the Company did not have the cash to finance existing operations. *See* Am. Compl., ¶¶ 66, 85-86, 102. And, Delgado, nevertheless, signed the 10-K knowing that statements made therein were false. These allegations are sufficient to raise a strong inference that Delgado knew that the public statements released by GDS involving the Remington acquisition were false. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004) ("Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued."); *Hoi Ming Michael Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012); *In re Semtech Corp. Secs. Litig.*, No. 17-7114, 2008 U.S. Dist. LEXIS 126135, at *34-35 n.7 (C.D. Cal. Dec. 25, 2008); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 404 (S.D.N.Y. 2005); *see also SEC v. Infinity Group Co.*, 212 F.3d 180, 193 (3d Cir. 2000) ("ignorance provides no defense to recklessness where a reasonable investigation would have revealed the truth to the defendant"); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007).[29]

---

[29] Because I found, *supra*, that Plaintiff has not adequately pled loss causation with regard to the allegations involving revenue projections in the 2013 and 2014 Forms 10-K, I need not address scienter as to this category of misrepresentations underlying Plaintiff's § 10(b) claim.

Taking all scienter-related allegations together, *i.e.*, recklessness and motive, I find that Plaintiff has sufficiently alleged a strong inference of scienter.  However, while I find that Plaintiff has sufficiently alleged the elements of material misrepresentations, scienter, economic loss and loss causation, Plaintiff has failed to allege reliance.  Therefore, he has not stated a claim under § 10(b).

### III.    Section 20(a) claim

Plaintiffs also allege that Individual Defendants are liable under Section 20(a) of the Securities Exchange Act. This statute reads, in pertinent part:

§ 78t. Liability of controlling persons and persons who aid and abet violations

(a) Joint and several liability

. . .

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable

. . .

15 U.S.C. § 78t(a); *see also Suprema*, 438 F.3d at 285 (discussing the statute). However, "liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya*, 564 F.3d at 252 (citing *In re Alpharma Sec. Litig.*, 372 F.3d 137, 153 (3d. Cir. 2004)). Because Plaintiff fails to sufficiently plead a claim under Section 10(b), it is "impossible to hold the [Individual Defendants] liable under § 20(a)." *Shapiro v. UJB Fin. Co.*, 964 F.2d 272, 279 (3d Cir. 1992). The Section 20(a) claims against individual defendants Delgado and Loppert are therefore also dismissed without prejudice.

**CONCLUSION**

For the foregoing reasons, the Moving Defendants' Motions to Dismiss are **GRANTED**. In lieu of dismissal, however, Plaintiff is given leave to amend his Amended Complaint within thirty days from the date of the Order accompanying this Opinion, in accordance with the rulings herein.

DATED: December 19, 2017

/s/      Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. District Court Judge