**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
:
JEFF HULL, *on behalf of himself*     :
*and all those similarly-situated*,     :     Civil Action No. 16-5153 (FLW)
:
       Plaintiff,     :     **OPINION**
:
       v.     :
:
GLOBAL DIGITAL SOLUTIONS, INC.,  :
 *et al.*,     :
:
       Defendants.     :
:
_____  :

**WOLFSON, United States District Judge**:

Lead Plaintiff Michael Perry ("Plaintiff") brings this putative securities class action, on behalf of himself and all other similarly situated individuals, against Global Digital Solutions, Inc. ("GDS" or "Company"), a company involved in specialty-vehicle manufacturing, as well as GDS's former Chief Executive Officer Richard J. Sullivan ("R. Sullivan"), former Chief Financial Officer David Loppert ("Loppert"), former director and Executive Vice President William J. Delgado ("Delgado"), and former directors Arthur F. Noterman ("Noterman") and Stephanie C. Sullivan ("S. Sullivan") (collectively "Individual Defendants") (GDS and Individual Defendants together referred to as "Defendants"), alleging violations under, *inter alia*, various provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and the rules promulgated thereunder. Plaintiff accuses Defendants of making false representations and omissions to artificially raise GDS's stock price in an effort to finance specific acquisitions and

1

raise cash using the inflated stock. The Court previously dismissed Plaintiff's Complaint without prejudice on December 19, 2017, holding that Plaintiff had failed to adequately allege reliance, an element of his securities claim. *See Hull v. Glob. Digital Sols., Inc.*, No. 16-5153, 2017 WL 6493148, at *17 (D.N.J. Dec. 19, 2017). In accordance with that opinion, Plaintiff filed a Second Amended Complaint ("SAC") on January 18, 2018. ECF No. 38.

In the instant matter, Defendants GDS, Delgado, and Loppert move for dismissal on the basis that the additional allegations in the SAC still do not satisfy Plaintiff's burden of pleading reliance. ECF Nos. 38, 41. In addition, Loppert separately moves for dismissal for lack of personal jurisdiction or venue. ECF. No. 41. For the reasons that follow, Defendants' motions are **DENIED**.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts of the case are fully laid out in the Court's previous opinion. *See Hull*, 2017 WL 6493148, at *2-4. For the sake of clarity, the Court states here the facts relevant to the current motions.

GDS is a company that, through its subsidiary, builds mobile command/communications and specialty vehicles for emergency and law enforcement operations. SAC at ¶¶ 91-93. During all relevant periods, GDS's stock traded on an over-the-counter exchange, OTCQB, under the ticker symbol "GDSI." *Id.* at ¶ 15. The putative class period is October 8, 2013 through August 11, 2016 ("Class Period"). *Id.* at ¶ 1. From August 12, 2013 through April 10, 2015, Loppert was GDS's Chief Financial Officer ("CFO"), *id.* at ¶ 17; Delgado was responsible for GDS's business development and served in various roles, such as President, CEO, CFO, Chairman, and Executive Vice President, *id.* at ¶ 18; and R. Sullivan was GDS's CEO from the start of the Class Period through May 13, 2016. *Id.* at ¶ 16. Plaintiff alleges that these individual defendants

participated in the day-to-day management and operations of GDS at the highest level, were privy to confidential information, and were directly or indirectly involved in drafting, producing, reviewing, approving, and/or disseminating false and misleading statements to deceive investors. *Id.* at ¶¶ 18, 23, 116.

More specifically, Plaintiff alleges that during the class period, unbeknownst to investors, GDS's stock was "worthless." *Id.* at ¶ 2. Plaintiff accuses Defendants of disseminating false and misleading statements and participating in several schemes designed to artificially inflate the price of GDS's common stock. *Id.* In the SAC, Plaintiff sets forth various alleged "schemes" perpetuated by Defendants:

1.  By way of press releases, Defendants misrepresented a failed merger with Airtronic USA, Inc. ("Airtronic") for $95 million, *id.* at ¶ 3;

2.  Defendants issued a misleading press release announcing that GDS "expects to announce several agreements regarding potential acquisitions," when in reality, Defendants knew GDS had neither the cash nor credible financing to acquire any company, *id.* at ¶ 4; and

3.  Defendants falsely issued press releases in March 2014, announcing an unsolicited bid to acquire, *inter alia*, Remington Outdoor Company, Inc. ("Remington") for over $1 billion in cash and stock, when, in fact, GDS had very little cash on hand, and no credible financing options, *id.* at ¶ 5.

Plaintiff further avers that Defendants used the artificially inflated stock to finance acquisitions. *Id.* at ¶ 90. Additional details for each of these schemes are described in *Hull*, 2017 WL 6493148 at *2-4.

On August 11, 2016, the SEC filed a civil complaint charging Defendants GDS, R. Sullivan, and Loppert with multiple counts of securities fraud, including claims related to the $95 million Airtronic contract, GDS's allegedly knowingly false revenue forecast for the first quarter of 2014, the documents announcing GDS's Remington offers, and the allegations concerning additional acquisitions. *Id.* at ¶ 104. Upon this news, GDS shares dropped 52% on August 12, 2016. *Id.* at ¶ 107.

Plaintiff alleges that only with the filing of the SEC complaint did the public learn of an SEC investigation into GDS and its officers. *Id.* at. ¶ 105. According to Plaintiff, the SEC Complaint revealed, for the first time, the full extent of Defendants' alleged schemes to artificially inflate the price of its stock, despite lacking any working businesses or revenue, in order to use the inflated stock to finance acquisitions. *Id.* at. ¶¶ 105–106.

Based on the above allegations, on August 24, 2016, Plaintiff brought this putative class action against Defendants, asserting two causes of action under the Securities Exchange Act: 1) violation of Section 10(b) against all Defendants; and 2) violation of Section 20(a) against the Individual Defendants. On December 19, 2017, this Court granted Defendants' Motions to Dismiss on certain grounds but granted Plaintiff leave to amend his Amended Complaint. *Hull,* 2017 WL 6493148 at *23. With respect to the Section 10(b) claim, the Court found that while Plaintiff adequately alleged material misrepresentations, scienter, economic loss, and loss causation, Plaintiff failed to allege that GDS's stock traded in an efficient market, which is required for pleading reliance under a fraud-on-the-market theory. *Id.* at *16-17, 22. The Court also dismissed without prejudice, the Section 20(a) claim, which is derivative of the Section 10(b) claim.

On January 18, 2018, Plaintiff filed the SAC, which is the current operative complaint. ECF No. 38. In the SAC, Plaintiff made additional factual allegations supporting his fraud-on-the-market presumption of reliance.[1] SAC at ¶ 127. In particular, Plaintiff alleged the following:

1. GDS's stock was listed on the over-the-counter stock market, which is an efficient and automated market, *id.* at ¶ 127(a);

2. GDS's stock had an average weekly trading volume of nearly 3.4 million shares, or 10.65% of outstanding shares during the Class Period, *id.* at ¶ 127(b);

3. GDS regularly disseminated press releases to national newswire services, *id.* at ¶ 127(c);

4. There were at least 195 news articles about GDS published during the Class Period, *id.* at ¶ 127(d);

5. There were 25 market makers for GDS stock during the class period, *id.* at ¶ 127(e);[2]

6. From January 22, 2014 to January 24, 2014, and on March 12, 2014, GDS was eligible for S-3 registration with a tradeable float in excess of $75 million, *id.* at ¶ 127(f);

7. GDS stock reacted quickly to unexpected GDS-related news, *id.* at ¶ 127(g); and

---

[1] I previously rejected Plaintiff's argument that it should be afforded the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

[2] These alleged market makers are: Cantor Fitzgerald & Co., Aegis Capital Corp., Archipelago Trading Services, Inc., Ascendiant Capital Markets, LLC, Automated Trading Desk Fin. Svcs., LLC, Biltmore International Corp., BMA Securities, Buckman, Buckman & Reid, Inc., Canaccord Genuity Inc, Capital Path Securities, LLC, Citadel Securities, Finance 500, Inc., G1 Execution Services, LLC, Guggenheim Securities, LLC, Intl. FCStone Fin., Inc., Maxim Group LLC, Puma Capital, LLC, R. F. Lafferty & Co., Inc., Stockcross Fin. Svcs., Inc., T.R. Winston & Company, LLC, Vandham Securities Corp., Vfinance Investments, Inc, VIRTU Americas LLC, Wilson-Davis & Co., Inc., and World Trade Financial Corporation.

8. False and misleading statements directly impacted the price of GDS stock. *Id.* at ¶ 127(h). Plaintiff alleges 17 specific instances of "price impact," including how the stock rose and fell in response to allegedly false or misleading statements in connection with the the Airtronic, Remington, and revenue forecast allegations, as well as the filing of the SEC complaint. *Id.* at ¶¶ 127(h), 131-133.

In the instant matter, Defendants seek dismissal of Plaintiff's SAC for failure to state a claim on the basis that Plaintiff did not adequately plead that GDS traded in an efficient market. ECF No. 39. In addition, Loppert separately moves for dismissal of the SAC for lack of personal jurisdiction and improper venue. ECF No. 41. Plaintiff opposes the motion, arguing that the additional allegations in the SAC support a finding of reliance, and that Loppert waived personal jurisdiction and venue objections. ECF No. 44.

## II.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "[f]ailure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under this standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the

plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts."

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

Under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

"Independent of the standard applicable to Rule 12(b)(6) motions," Fed. R. Civ. P. 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of

fraud." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002); *see also* Fed.

R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a

person's mind may be alleged generally."). To satisfy this heightened pleading standard, a

plaintiff must state the circumstances of his alleged cause of action with "sufficient particularity

to place the defendant on notice of the 'precise misconduct with which [it is] charged.'"

*Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America*,

361 F.3d 217, 223-24 (3d Cir. 2004)). Specifically, the plaintiff must plead or allege the "date,

time and place of the alleged fraud or otherwise inject precision or some measure of

substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200 (citing *Lum*, 361 F.3d at 224).

Indeed, the Third Circuit has advised that, at a minimum, Rule 9(b) requires a plaintiff to allege

the "essential factual background that would accompany 'the first paragraph of any newspaper

story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema*

*Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311

F.3d at 216).

In addition to Rule 9(b)'s heightened pleading requirements, Congress enacted the

Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C § 78u *et seq.*, to require an even

higher pleading standard for plaintiffs bringing private securities fraud actions. *In re Suprema,*

438 F.3d at 276. This heightened pleading standard is targeted at preventing abusive securities

litigation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Private

securities fraud actions . . . if not adequately contained, can be employed abusively to impose

substantial costs on companies and individuals whose conduct conforms to the law."); *Merrill*

*Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (identifying "ways in which

the class-action device was being used to injure the entire U.S. economy" and listing examples such as "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent") (quotations and citations omitted).

The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u-4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u-4(b)(1)). Second, the complaint must, "with respect to each act or omission alleged to violate this [chapter], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Both provisions of the PSLRA require facts to be pled with "particularity." *Avaya*, 564 F.3d at 253. This particularity language "echoes precisely Fed. R. Civ. P. 9(b)." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999); *see* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."). Indeed, although the PSLRA replaces Rule 9(b) as the pleading standard governing private securities class actions, the rule's particularity requirement "is comparable to and effectively subsumed by the requirements of [§ 78u-4(b)(1) of] the PSLRA." *Avaya*, 564 F.3d at 253 (citations omitted). This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *In re Advanta*, 180 F.3d at 534 (quotations marks omitted).

III.    DISCUSSION

### a. Section 10(b) of the Securities Exchange Act

Defendants move to dismiss the SAC, arguing that the amended allegations are still insufficient to meet the fraud-on-the-market presumption of reliance under Section 10(b) of the Securities Exchange Act and Rule 10b-5. The private right of action under Section 10(b) and Rule 10b-5 "creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). In relevant part, Rule 10b-5 makes it unlawful for an individual "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b) and Rule 10b-5, the plaintiff must allege: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, also referred to as transactional causation, (5) economic loss, and (6) loss causation." *Gold v. Ford Motor Co.*, 577 F. App'x 120, 122 (3d Cir. 2014) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

On the element of reliance, a securities fraud plaintiff must plead facts to indicate a causal link between the alleged misrepresentation and the plaintiff's transaction. *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 292 (D.N.J. 2007) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)). Since requiring proof of direct reliance "would place an unnecessarily unrealistic evidentiary burden on [a] plaintiff who has traded on an impersonal market," *Basic,* 485 U.S. at 245, a plaintiff can obtain a presumption of reliance by successfully invoking the fraud-on-the market theory. "The fraud-on-the-market premise is that the price of a security traded in an efficient market will reflect all publicly available information about a

company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 458 (2013).

To invoke the fraud-on-the-market theory, a plaintiff must first establish that the securities at issue traded in an open and efficient market. *In re Burlington*, 114 F.3d at 1419 (citing *Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir. 1992); *Peil v. Speiser*, 806 F.2d 1154, 1161 (3d Cir. 1986); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 208 (E.D. Pa. 2008), *aff'd sub nom. In re DVI, Inc. Sec. Litig.,* 639 F.3d 623 (3d Cir. 2011). "[I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company  and its business." *Basic*, 485 U.S. at 241 (citation omitted). The Third Circuit has defined an "efficient" market as one in which "information important to reasonable investors . . . is immediately incorporated into stock prices." *In re Burlington*, 114 F.3d at 1425 (citation omitted). "[I]f a market is shown to be efficient, courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities." *Amgen*, 568 U.S. at 462 (citing *Basic*, 485 U.S. at 245-247). Importantly, at a motion to dismiss stage, "the question … is not whether plaintiff has proved an efficient market, but whether he has pleaded one." *Hayes*, 982 F.2d at 107.

Courts consider several factors to assess whether a plaintiff has pled market efficiency. These include (1) percentage of weekly trading volume; (2) coverage of a company's stock in securities analyst reports; (3) the reported number of market-makers; (4) the company's eligibility to file an S-3 registration statement; and (5) quick responses in stock price caused by unexpected corporate events or financial releases. *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); *see also Hayes*, 982 F.2d at 107 n. 1 (summarizing the role of the *Cammer*

factors at the pleading stage). These are often referred to as the *Cammer* factors. Courts have also considered the (6) bid-ask spread, *see Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003); (7) number of institutional investors, *see Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 511 (D. Kan. 2014); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 637 (N.D. Ala. 2009); (8) float, *see Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001); and (9) percentage of shares outstanding that has been sold short, *see Petrie v. Electronic Game Card, Inc.*, 308 F.R.D. 336, 357 (C.D. Cal. 2015). Courts should not view these factors as a checklist that a plaintiff must pass in order to plead market efficiency, but rather should use them as an analytical tool to assist in its analysis. *See Unger v. Amedisys Inc.*, 401 F.3d 316, 325 (5th Cir. 2005). Indeed, Courts are permissive when considering *Cammer* allegations in pleadings, viewing the factors as "an acceptable basic framework for evaluating whether a plaintiff's allegations of efficiency are plausible." *In re Tronox, Inc. Sec. Litig.*, No. 09-6220, 2010 WL 2835545, at *12 n. 166 (S.D.N.Y. June 28, 2010). Thus, at the motion to dismiss stage, Plaintiff may use *Cammer* to allege facts to suggest that the stock at issue traded in an efficient market, and need not include allegations supporting all, or even most, of the *Cammer* factors. *See Hayes v. Gross*, 982 F.2d 104, 107 n. 1 (3d Cir.1992) (noting that the *Cammer* court "ruling on a motion for summary judgment under Fed.R.Civ.P. 56, considered whether plaintiffs' affidavit showed 'specific facts' indicating an efficient market" but that "[a]t the time of a motion to dismiss under Rule 12(b)(6), however, a plaintiff need not show 'specific facts' as required under Rule 56(e)").

Here, Plaintiff contends that the SAC adequately alleges reliance by demonstrating direct evidence of price impact and market efficiency. Plaintiff alleges that four of the *Cammer* factors weigh in favor of finding reliance: percentage of weekly trading volume, reported number of

market makers, eligibility for S-3 registration, and quick responses in stock price caused by unexpected corporate events or financial releases. Defendants argue that these allegations are deficient, and additionally argue that the lack of other *Cammer* factors warrants dismissal. I address each of the relevant *Cammer* factors at issue in turn. Because I must review the allegations supporting these factors permissively at the pleading stage, I find that Plaintiff has done just enough to support a fraud-on-the-market presumption of reliance.

      i.     *Average weekly trading volume*

A high average trading volume supports a finding of market efficiency because it "implies significant investor interest in the company," which in turn "implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer,* 711 F.Supp. at 1286. Although there is no bright line rule for adequate trading volume, average weekly trading of 2% or more of the outstanding shares justifies a strong presumption of market efficiency. *Id.*

Here, Plaintiff alleges an average weekly trading volume of nearly 3.4 million shares, or 10.65% of outstanding shares during the Class Period, which is typically more than sufficient to survive a motion to dismiss. *See In re DVI.*, 249 F.R.D. at 209 (holding that even a "1% average weekly trading volume justifies a substantial presumption that a security trades in an efficient market"); *See In re Schering-Plough Corp./ENHANCE Sec. Litig.*, No. 8-397, 2012 WL 4482032, at *5 (D.N.J. Sept. 25, 2012) (holding that a trading volume of around 4.18 percent for common stock, and 4.63 percent for preferred stock was "well over the threshold justifying a 'strong presumption'"); *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 349 (C.D. Cal. 2015) (finding that "the average weekly trading volume of EGC's stock during the Class Period was 3.3%, which, under *Cammer*, justifies a strong presumption of an efficient market").

Instead of challenging the sufficiency of a 10.65% trading volume, Defendants contest the credibility of the allegation because of purportedly "contradictory facts" in Plaintiff's Complaint. In particular, Defendants claim the Complaint's stated average weekly trading volume of 3,384,415 shares, or an average daily trading volume of 676,883 shares, is inconsistent with the allegation that, on December 2, 2013, when GDS failed to complete the Airtronics merger, the GDS stock had an "immense trading volume of 304,600 shares." In Defendants' view, Plaintiff's characterization of this one-day trading volume as "immense" undermines the claim that the average weekly trading volume was more than twice as high.

The Court does not share Defendants' concern about this purported contradiction at this junction. As already noted, the average weekly trading volume of 10.65% of outstanding shares is well above the 2% threshold set out in *Cammer*. While true that this one-day trading volume is inconsistent with the overall average weekly volume, that is not an issue for Plaintiff at this pleading stage. *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011) (accepting "the inclusion of a highly volatile period" that "may skew the average weekly trading volume" and affording Plaintiff "a substantial presumption that the market for DVI's common stock was efficient"). Importantly, the single-day-trade number by itself does not preclude the possibility that the alleged weekly trading volume of 10.65% is, nevertheless, accurate. The Court is bound by the pleadings, and thus, is not persuaded that a single reference to "immense" trading volume on a single day is sufficient to find a contradiction in the average weekly trading volume for the class period as alleged in the SAC.

Indeed, because Defendants have failed to demonstrate any real contradictions in the SAC, I do not find persuasive the cases on which Defendants rely for support on this issue, which involve instances of clear contradiction. *See Kalick v. United States*, 35 F. Supp. 3d 639,

647 (D.N.J. 2014), *aff'd*, 604 F. App'x 108 (3d Cir. 2015) (finding that separate contradictory allegations about whether a meeting took place "further obscure[s] the factual basis on which Plaintiff's due process claims may rest"). Here, the SAC's reference to allegedly lower trading volume on a single day as "immense," although perhaps an odd word choice, is not a contradiction. As one court stated in a case on which Defendants rely, a court should not disregard allegations in a Complaint when they "do[ ] not appear to be advancing completely contradictory theories." *BanxCorp v. Bankrate Inc.*, No. 07-3398, 2011 WL 6934836, at *21 (D.N.J. Dec. 30, 2011). As Plaintiff does not advance contradictory theories here, GDS's alleged trading volume weighs in favor of market efficiency.

### ii. *Market makers*

"A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations … and who stands ready to buy or sell at these publicly quoted prices." *In re Countrywide,* 273 F.R.D. at 613–14. "The more market-makers for a particular security (and, relatedly, the greater the volume of the security the market-makers are prepared to handle), the more reasonable it is to infer that the security is liquid, and, therefore, more likely the market for that security is efficient." *Id.* at 614. In *Cammer*, eleven market makers supported a finding of an efficient market. 711 F.Supp. at 1283. Courts have held that there need only be "some market makers" to satisfy this factor. *In re Dynex Capital, Inc. Sec. Litig.,* No. 5-1897, 2011 WL 781215 at *5 (S.D.N.Y. Mar. 7, 2011) (thirteen market makers sufficient); *see also In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) (six market makers sufficient).

Here, Plaintiff alleges that there were 25 market makers for GDSI stock during the Class Period. SAC at ¶127. Defendants argue that Plaintiff failed to adequately substantiate its allegation because Plaintiff did not allege any facts regarding the market makers' activity related

to trading GDS stock. In support of this argument, they point to a number of cases that note that "[t]he number of market makers has limited probative value without information regarding the volume of shares that each market maker committed to trade, the volume of shares they actually traded, and the prices at which they did so." *See Griffin v. GK Intelligent Sys.*, 196 F.R.D. 298, 304 (S.D. Tex. 2000); *see also Unger*, 401 F.3d at 324; *O'Neil v. Appel*, 165 F.R.D. 479, 502 (W.D. Mich. 1995).

The Court recognizes that the market maker allegations in the SAC are threadbare. But while allegations regarding market makers' activity trading stock would further bolster Plaintiff's claims, their absence is not fatal at the pleading stage. *Accord Cheney*, 213 F.R.D. at 500 ("While the Court recognizes that additional information would aid the Court in its determination of efficiency for purposes of class certification, it is not essential as the Court is not making a final determination on efficiency … the existence of multiple market makers in addition to other factors support efficiency"); *see also ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1255 (C.D. Cal. 2015) (finding that Plaintiff's allegation that there were market makers "weighs in favor of a finding that it has sufficiently pled the existence of an efficient market" but is not a "particularly probative" factor on its own). Rather, on a summary judgment motion, Plaintiff would necessarily have to provide additional evidence regarding these market makers' trading activities as to GDS' stock. But we are at the motion to dismiss stage.

Thus, this factor slightly weighs in favor of efficiency.

### iii. S-3 registration

*Cammer* states that, with regards to demonstrating market efficiency, "it would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings." *Cammer*, 711 F.Supp. at 1287. The SEC registration Form S-3 is a short form

reserved for companies (1) with $75 million in common equity held by non-affiliates of the registrant and (2) that have filed reports with the SEC for 12 consecutive months. 17 C.F.R. § 239.13. "Corporations permitted to use the S-3 form are thus presumed to be actively traded and widely followed. Therefore, a company's ability to file an S-3 Registration Statement points to market efficiency." *Krogman v. Sterritt*, 202 F.R.D. 467, 476 (N.D. Tex. 2001) (internal citation omitted).

Plaintiff alleges that "[d]uring part of the Class Period, specifically on January 22, 2014, January 23, 2014, January 24, 2014, and March 12, 2014, Global Digital was eligible for S-3 registration, with a tradeable float in excess of $75 million." SAC at ¶ 127(f). Defendants argue that an allegation of four days of eligibility out of a 34-month Class Period is insufficient. Although at the class certification stage, other courts have found that company ineligibility for S-3 registration for a majority of the class period tips this factor against market efficiency, Plaintiff's allegations are sufficient at the motion to dismiss stage. *See, e.g., Cammer,* 711 F.Supp. at 1287 (rejecting Form S–3 eligibility as a bright-line test for market efficiency); *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 352 (C.D. Cal. 2015) (finding this factor not fatal to a finding of market efficiency); *Nguyen v. Radient Pharm. Corp.,* 287 F.R.D. 563, 574 (C.D. Cal. 2012) (same). Similarly, here, Plaintiff's allegations regarding a few discrete periods of time when the Company was S-3 eligible are not fatal to Plaintiff's claim, even if they do not strongly support a finding of market efficiency.

### iv.    *Market reaction to announcements*

Under *Cammer*, evidence of a causal relationship between unexpected corporate events or financial releases and an immediate response in the stock price is an important indicator of

market efficiency. 711 F.Supp. at 1287 (noting that this factor is "the essence of an efficient market and the foundation for the fraud on the market theory.").

Plaintiff alleges that "[d]uring the Class Period, Global Digital stock quickly reacted to unexpected Company-specific news with its share price rising and falling in the expected direction in response to such news, an important and persuasive indication of market efficiency." SAC at ¶ 127(g). The SAC alleges seventeen separate instances of Company-specific news with corresponding changes in stock price, *id.* at ¶ 127(h), including specific direct evidence of price impact in connection with the Airtronic, Remington, and revenue forecast allegations, as well as the filing of the SEC complaint. *Id.* at ¶¶131-133.

Defendants argue that the Court should discount these allegations regarding market reaction to GDS-specific news, because Plaintiff failed to delineate, with specificity, the public release of news, the exact timing of the alleged market reaction, or the causal relationship between the news and the stock value. These arguments, however, are premature at the motion to dismiss stage. The SAC alleges specific instances of price impact that cannot be easily explained away: for example, Plaintiff alleges that share prices rose upon the allegedly false or misleading statements connected to the Airtronic and Remington allegations, and then fell drastically immediately following public reports questioning the veracity of the statements. These are sufficient allegations of price impact at the pleading stage. The Court must take these allegations as true, and the merits of the allegations, including other factors that may have caused the stock price to rise or fall in each of the seventeen separate instances cited by Plaintiff, are not now before the Court.

As such, I find that Plaintiff has sufficiently alleged the market-reaction element.

v.      *Other factors*

Finally, Defendants argue that the SAC does not sufficiently plead reliance because it contains no allegations regarding additional factors that this Court enumerated in its initial opinion. These are: coverage of the stock by a significant number of securities analysts; the stock's bid-ask spread; the number of institutional investors; the percentage of shares held by insiders, or the float; and the percentage of shares outstanding that has been sold short. *Hull,* 2017 WL 6493148 at *17.

In that regard, Defendants primarily contend that Plaintiff's failure to allege GDS's stock was covered by a "significant number of securities analysts" during the class period, should be fatal to Plaintiff's 10(b) claim. *Cammer*, 711 F. Supp. at 1286. In *Cammer*, the issuance of 15 company research reports during the class period supported a finding of market efficiency. *Id.* at 1283 n. 30. Defendants argue that Plaintiff alleges only that GDS initiated communications and that news articles on GDS were published, not that securities analysts followed GDS stock or reported on the stock. However, while *Cammer* and the subsequent case law call for allegations of securities analysts' coverage at class certification, Plaintiff's failure to specifically allege coverage by securities analysts, alone, is not fatal at the pleading stage. The same is true for Plaintiff's failure to even cursorily address the other factors. *See Seidman v. Am. Mobile Sys.*, 813 F. Supp. 323, 324 (E.D. Pa. 1993) (finding that plaintiff had adequately pleaded market efficiency at the motion to dismiss stage despite not pleading particular factors such as securities analysts' coverage).

More importantly, however, the enumerated factors to be considered in determining whether the subject stock traded in an efficient market are an analytical tool, not a mere checklist. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-1898, 2006 WL 2161887, at *5 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008). *Cammer*

does not require "that every factor be established," *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 432 (S.D.N.Y. 2014), and, indeed, courts have found allegations supporting as few as two or three of the factors to be sufficient at the pleading stage. *See, e.g.*, *In re China Med. Sec. Litig.*, No. 11-1061, 2012 WL 5713399, at *5 (C.D. Cal. May 10, 2012) (three factors); *Burritt v. NutraCea*, No. 09-406, 2010 WL 668806, at *8–9 (D. Ariz. Feb. 25, 2010) (two factors); *see also Seidman*, 813 F.Supp. at 325 & n. 1 (finding that the complaint adequately pled the existence of an efficient market only by alleging that stock price plunged following sudden disclosures by corporation). "The question on a motion to dismiss is not whether plaintiff has proved an efficient market, but whether he has pleaded one." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005) (citing *Hayes*, 982 F.2d at 107). The Court tasked Plaintiff with pleading sufficient facts to support a presumption of reliance; he did so, albeit not resoundingly. Indeed, the SAC includes allegations supporting four factors, but only those related to average weekly trading volume and market reaction solidly support a finding of efficiency. Yet not every factor need weigh in Plaintiff's favor or even be alleged, when considered the motion to dismiss stage. Accordingly, while not overwhelming, I find that Plaintiff's *Cammer* allegations suffice at this stage to permit Plaintiff to go forward with his 10(b) claim.[3]

### b. Section 20(a) of the Securities Exchange Act

Plaintiff also alleges that Individual Defendants are liable under Section 20(a) of the Securities Exchange Act. This statute reads, in pertinent part:

§ 78t. Liability of controlling persons and persons who aid and abet violations
(a) Joint and several liability

---

[3] It should be noted that although I deny Defendants' motions, Plaintiff's amended allegations are just barely sufficient to survive, even accounting for the leniency I must afford Plaintiff at the pleading stage.

> ...
>
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ...

15 U.S.C. § 78t(a); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 285 (3d Cir. 2006). "[L]iability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya*, 564 F.3d at 252 (citing *In re Alpharma Sec. Litig.*, 372 F.3d 137, 153 (3d. Cir. 2004)). The plaintiff must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws. *Suprema*, 438 F.3d at 284 (internal citations omitted). "The pleading of facts that 'support a reasonable inference that [defendants] had the potential to influence and direct the activities of the primary violator' will survive a motion to dismiss." *Palladin Partners v. Gaon*, No. 05-3305, 2006 WL 2460650, at *16 (D.N.J. Aug. 22, 2006) (internal citations omitted)

In this case, Plaintiffs have adequately pleaded their Section 20(a) claim against Individual Defendants. First, Plaintiffs have adequately alleged a primary violation of Section 10(b). Further, the Complaint alleges that Individual Defendants, including Delgado and Loppert, were high-level officers and executives of GDS during the Class Period who controlled the Company's SEC filings and other public disclosures. It is, therefore, "reasonable to find that [Defendants were] responsible for the information contained in the SEC filings because of the nature of [their] position[s]." *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp. 2d 378, 396 (E.D. Pa. 2005). Individual Defendants, thus, fall within the meaning of "controlling persons" under Section 20(a). *See Dudley v. Haub*, No. 11-05196, 2013 WL 1845519, at *20 (D.N.J. Apr. 30, 2013) ("[T]he Complaint alleges that Claus, Galgano, Haub, and Brace were each high-level officers of A & P during the Class Period who controlled the Company's SEC

filings and other public disclosures…This is sufficient to place them within the meaning of "controlling persons" under Section 20(a)").

Defendants' motion to dismiss Plaintiff's Section 20(a) claim is, therefore, denied.

### c. Defendant Loppert's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue

Defendant Loppert moves separately to dismiss for lack of personal jurisdiction and improper venue. "Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Insurance Corp. of Ireland, Ltd., et al. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703 (1982). "[W]here a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter." *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 443 (3d Cir. 1999) (citation omitted). A party who fails to raise personal jurisdiction as a defense in a Rule 12 motion waives the defense and cannot raise it in an answer or in a subsequent motion. *See Myers v. American Dental Ass'n,* 695 F.2d 716, 720 (3d. Cir.1982) (discussing the Fed. R. Civ. P. Rule 12(h) waiver provision). *See also Rates Technology v. Nortel Networks Corp.*, 399 F.3d 1302, 1307 (Fed. Cir.), *cert. denied*, 545 U.S. 1141 (2005) (stating that Rule 12(h) "advises a litigant to exercise great diligence in challenging personal jurisdiction ... [and this defense must be raised] at the time the first significant defensive move is made—whether by way of a Rule 12 motion or in a responsive pleading") (citation omitted). Like the defense of lack of personal jurisdiction, the defense of improper venue is waived if not raised in the first instance. Fed. R. Civ. P. 12(h); *Myers*, 695 F.2d at 720 ("If a party files a pre-answer motion but fails to raise one of the defenses [such as improper venue], the party waives the omitted defense and cannot subsequently raise it in his answer or

otherwise."). The filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment of the pleading. *See Bell v. Lockheed Martin Corp.*, Nos. 08–6292, 10–4297, 2011 WL 1467365, at *9 (D.N.J. 2011); *Chan v. County of Lancaster*, No. 10-3424, 2012 WL 4510776, at *13 (E.D. Pa. 2012).

Here, Loppert filed a 12(b)(6) motion to dismiss Plaintiff's initial Complaint for failure to state a claim on May 8, 2017. ECF No. 29. As explained above, the Court granted this motion and granted Plaintiff leave to amend. At that time, Loppert did not raise a personal jurisdiction or improper venue defense until he filed the present motion on February 13, 2018. ECF No. 41. Accordingly, Loppert waived personal jurisdiction and improper venue as defenses when he filed his initial 12(b)(6) motion to dismiss, which neither raised a jurisdictional argument nor improper venue.[4]

Loppert does not contest that he failed to raise personal jurisdiction and venue arguments in his initial responsive pleading. He instead argues that the cases that Plaintiff cites to support the waiver argument, *Bell* and *Consol. Rail Corp. v. Grand Trunk W. R. Co.*, 592 F. Supp. 562 (E. D. Pa. 1984), are distinguishable. For instance, Loppert argues that the defendant in *Bell,*

---

[4] Loppert argues that upon his 12(b)(2) motion to dismiss for want of personal jurisdiction, the burden now lies with Plaintiff to establish personal jurisdiction. However, because Loppert previously moved for dismissal, he has waived personal jurisdiction, eliminating any burden to establish such jurisdiction. Loppert inappropriately relies on case law in which the defendant raised a 12(b)(2) motion in the first instance. *See Sprout Retail, Inc. v. USConnect LLC*, No. 17-00135, 2017 WL 1351401, at *6 (D.N.J. Apr. 10, 2017); *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004); *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324 (3d Cir. 2009); *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan, Ass'n*, 819 F.2d 434 (3d Cir. 1987); *Acteon, Inc. v. Vista Dental Prods*, No. 05-3847, 2006 WL 1207999, at *2 (D.N.J. May 3, 2006). These cases are distinguishable from the present motion, in which Loppert raises a personal jurisdiction defense 9 months after his first 12(b)(6) motion.

unlike here, "voluntarily submitted to the Court's jurisdiction, appealed one of the Court's decisions, had meaningfully participated in the proceedings and filed an answer conceding that the District Court for the District of New Jersey was the proper forum." ECF No. 47 at 2-3. These purported distinctions are not relevant, however. Rather, importantly, Loppert neglected his opportunity to timely raise personal jurisdiction and venue defenses in his initial motion to dismiss. This very act voluntarily submitted Loppert to the Court's jurisdiction and constituted meaningful participation in the proceedings. As the Court in *Consolidated Rail* succinctly put it, "Under Rule 12(h), if a party proceeds to challenge a complaint by motion and fails to raise the specific defenses of lack of personal jurisdiction, improper venue, insufficiency of process, and insufficiency of service of process in the motion, these defenses are waived and cannot subsequently be raised." 592 F. Supp. at 566–67.

Loppert asks the Court, in the alternative, to exercise its discretion to excuse Loppert from the requirements of Rule 12 and dismiss the SAC. As Loppert notes, a court may exercise its discretion to consider defenses that would otherwise be barred if such consideration would advance the court's charge "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. The Court declines to exercise this discretion. A denial of Loppert's 12(b)(2) motion in accordance with Rule 12 better serves the principles of justice and efficiency in this case. *See Bel-Ray Co.*, 181 F.3d at 443 ("Because there 'exists a strong policy to conserve judicial time and resources,' we have held that 'preliminary matters such as … personal jurisdiction … should be raised and disposed of before the court considers the merits or quasi-merits of a controversy.'") (citing *Wyrough & Loser, Inc. v. Pelmor Labs., Inc.*, 376 F.2d 543, 547 (3d Cir. 1967)). Accordingly, Loppert's motions to dismiss for lack of personal jurisdiction and improper venue are denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss the Second Amended

Complaint are **DENIED**.


Dated: September 14, 2018                                   /s/ Freda L. Wolfson
                                                           Hon. Freda L. Wolfson
                                                           United States District Judge